No. 89,793

STATE OF KANSAS, *Appellee,* v. NOAH J. GLEASON, *Appellant.*
(88 P.3d 218)

Opinion filed April 23, 2004.

*Mary D. Curtis,* assistant appellate defender, argued the cause and was on the brief for appellant. *Noah J. Gleason,* appellant, was on a supplemental brief pro se.

*Victor J. Braden,* assistant county attorney, argued the cause, and *Phill Kline,* attorney general, was with him on the briefs for appellee.

The opinion of the court was delivered by

NUSS, J.: Noah Gleason appeals his conviction of first-degree felony murder and the resulting life sentence. Our jurisdiction is under K.S.A. 22-3601(b)(1), a maximum sentence of life imprisonment imposed.

The issues on appeal and this court's accompanying holdings are as follows:

1. Did the district court commit error when it gave an aiding and abetting instruction to the jury? No.

2. Did the prosecutor's purported violation of a motion in limine also violate Gleason's right to a fair trial? No.

3. Did Gleason receive effective assistance of counsel through trial? Yes.

4. Did trial counsel have a conflict of interest which prohibited his representation of Gleason at the sentencing hearing? No.

5. Was Gleason's sentence appropriate? Yes.

Accordingly, we affirm.

FACTS:

Clarence Rinke was found dead of a gunshot wound on the kitchen floor of his home in rural Jefferson County on October 14, 1999. Approximately 2½ years later, on April 2, 2002, Charolette Bennett, Collin Cady, and the defendant, Noah Gleason, were arrested in connection with Rinke's death.

Cady and Bennett agreed to testify against Gleason as part of a plea agreement. Their testimony, in which they corroborated each other, established the following.

Gleason had purchased marijuana from Rinke and had been in his house; it was Gleason's plan to burglarize Rinke's home to steal money and marijuana. Gleason told Cady that there would be approximately $70,000 at Rinke's house and that he wanted Rinke present to open the safe. Gleason and Cady checked out the Rinke area about a week and a half prior to the actual burglary. Gleason purchased coveralls at Bailey's in Lawrence. He also purchased gloves and masks to conceal their identities; tennis shoes to throw away after the crime; and tote bags to carry the marijuana, money, and their guns. They had two weapons, a .38 revolver and a shotgun, later sawn off, that Gleason purchased at Jayhawk Pawn and Jewelry in Lawrence. They had cell phones, two shotgun shells loaded with bird shot, and two walkie-talkies.

Gleason and Cady decided to have Bennett, who was sexually involved with Cady, serve as their driver and drop them off at the gate of Rinke's house. Bennett was to then lure Rinke out of his house by pushing the button on the gate intercom and telling Rinke that her car was stuck. She was to receive $1,000 for her help.

Cady called Gleason the morning of October 14, 1999, who told him to contact Bennett and meet at Johnny's Tavern in Lawrence at 7 p.m. Bennett and Cady went to Johnny's around 7 p.m., and Gleason arrived as Bennett and Cady were smoking marijuana in Cady's car. The three of them entered the bar, drank a shot of alcohol, and left. They then went to Gleason's property to put on the coveralls and get the weapons. From there they drove to Gleason's former house on 13th Street, near Rinke's, to show Bennett where to later park the car and wait for them. They left around 7

or 7:30 p.m., and she then drove them in Gleason's mother's car to Rinke's property.

Cady, who had been carrying one of Gleason's cell phones, and Gleason then left the car and hid in the woods next to Rinke's driveway. Though Gleason had been recuperating from a serious accident, according to Cady he was in good physical condition at the time. Bennett was given Gleason's other cell phone and eventually received Cady's call telling her to hit the button on the intercom. She then told Rinke over his intercom that she met a guy at a bar who gave her directions to a house which she could not find but her car had gotten stuck. When Rinke offered to pull her out with his tractor, Bennett called Gleason and Cady on the cell phone to inform them that Rinke was on his way to help her.

Rinke came out on his four-wheeler to his barn, and from there drove his tractor to the gate to help Bennett. Before Rinke arrived, Bennett left and drove to Gleason's former property on 13th Street where she smoked marijuana while she waited for Cady to call her to pick them up at Rinke's.

At that point Gleason and Cady entered Rinke's house and began looking for cash or drugs. They heard the tractor coming back, and Gleason mentioned backing out of the plan. Gleason then exited the house to watch for Rinke, and Cady remained in the mud room. Rinke saw Cady and bolted at him, so Cady "bonked" him on the head with the sawed-off shotgun. Rinke grabbed for the shotgun, and it discharged, hitting Rinke.

Cady got scared and took off running. After he left, Rinke, though seriously wounded, called 911.

Cady ran to a heavily wooded area, ejected the spent shell from the shotgun, loaded a live round, and continued running. He heard police sirens and took off his coveralls, wadding them up in the duffel bag and burying them under some leaves and a tree. He continued running and then buried the shotgun in the woods. He then called Bennett on the cell phone and told her to stay put and wait for them.

Gleason arrived at their designated meeting place, Gleason's old house on 13th Street. He told Bennett that Cady had accidentally shot Rinke and that he and Cady had gotten separated. Cady ar-

rived 15 to 20 minutes later very distraught and without the coveralls, the bag, or the shotgun. Gleason yelled at him because he had left behind evidence. Gleason told Bennett if she breathed a word of anything that happened, he would personally kill her.

They stashed their shoes, Gleason's .38 revolver, and Gleason's coveralls on the property. Gleason then drove all of them to Johnny's Tavern, where they stayed until closing time. The next day, they retrieved the evidence and burned it in a trash barrel. On two later occasions, Gleason dropped off Cady to look for the shotgun. Bennett and Cady considered Gleason the ringleader of the plan.

Cady's and Bennett's testimony was fleshed out at the trial by other witnesses and exhibits.

Law enforcement was notified of Rinke's 911 call at 9:41 p.m. and arrived at 10:23 p.m. Based on bloodstain evidence, they determined that Rinke had suffered a blow to the head and bled profusely in the mud room before collapsing in the kitchen. They found brown jersey gloves in the mud room, approximately 75 pounds of marijuana in a freezer, and just over $570,000 in cash elsewhere in the house.

Four days later, on October 18, 1999, the KBI interviewed Gleason. Gleason stated that the last time he had been to Rinke's house was August 1998, but that they had talked on the phone on October 14, 1999, regarding a small cooler that Gleason had borrowed. Gleason claimed he was at Johnny's Tavern from 8:30 p.m. until 12:30 or 1 a.m. the night of October 14.

On or about February 3, 2000, after a discovery by Rinke's neighbor, law enforcement found, in the woods near Rinke's home, coveralls that contained an expended shotgun shell and a pair of brown gloves. The coveralls were wrapped around two bags. The manufacturer of the coveralls verified that similar coveralls were sold at Bailey's in Lawrence.

Approximately 2 years later, on April 2, 2002, the KBI again interviewed Gleason. He denied having any involvement in Rinke's murder, but admitted that he had been to Rinke's house. Gleason admitted buying a weapon, but claimed it had been stolen. He also

admitted that he and an individual named Denny Cooper had previously discussed the possibility of robbing Rinke at his home.

The next day, April 3, based upon information from Cady, law enforcement searched a wooded area south of Rinke's home where they located a single-shot, 12-gauge, sawed-off shotgun containing a live round. The shotgun serial number confirmed it was the one Gleason had purchased approximately 2 months before the murder. A recovered shell further demonstrated by its markings that Gleason's shotgun was the murder weapon.

That same day, after Gleason was arrested and jailed, James Collins, Bennett's common-law husband, received a collect call from him. Gleason asked if Bennett had said anything, and when Collins replied that she had not, Gleason said: "You just tell her to keep her fucking mouth shut." Phone records confirmed that for the jail phone available to prisoners, one call was made to James Collins on that day.

Gleason's phone records confirmed that at 9:23 a.m. on the day of the murder, a phone call was made to his residence from the cell phone he had given to Cady. Phone records also revealed that at 4:47 p.m., a call was made from Gleason's cell phone to Rinke's residence. At 6:18 and 6:40 p.m., calls were made to Gleason's residence from the cell phone he had given to Cady. At 8:35, 9:09, 9:14, 9:17, and 9:46 p.m., calls were made from the cell phone Gleason had given to Cady to the cell phone Gleason had given to Bennett.

There were no calls from either Rinke's home phone or cell phone to any of Gleason's phones on October 14. However, Sheryl. Gleason, Noah Gleason's ex-wife, testified Rinke called her between 8 and 9 p.m. that day. Rinke told her he had received a strange call from Gleason earlier that day and that Gleason wanted to come by and return a cheap cooler that he had kept for over a year.

A witness named Denny Cooper testified he and Gleason used to work together and smoke marijuana together. Gleason called Rinke, his marijuana dealer, "the old man." During the winter of 1997, Gleason had spoken to Cooper about trying to rob the old man of whatever they could get out of the house. Gleason specu-

lated that there was a small safe in the basement containing up to 200 pounds of marijuana, as well as cash. Cooper did not take Gleason seriously.

By contrast, Gleason's defense contended (1) he had been at Johnny's Tavern that night and (2) he was physically unable to have participated in the events due to injury. However, Stephen Pearson spoke with Gleason after midnight the evening of the murder at Johnny's and testified Gleason was walking normally.

Kevin Horch saw Gleason at Johnny's Tavern on October 14 with a dark-haired woman, later identified as Dianne Cox, now Dianne Gleason. According to him, Gleason and the woman came in around 7:30 p.m. and were there around 2 a.m., when the bar closed. He also saw Cady at Johnny's that night.

Dianne Gleason, Gleason's current wife, testified that they saw each other on October 14 at Johnny's around 7:30 to 8 p.m. She stayed about an hour and a half. Gleason told Dianne that a friend of his had borrowed his car. She did not see Cady or Bennett at Johnny's.

In addition to Pearson, several witnesses testified concerning Gleason's physical condition. His mother testified that Gleason had a serious motorcycle accident in May 1999; he was able to walk, but had a crooked gait. Stephen Munns, an orthopedic surgeon, treated Gleason for broken bones in both of his arms, a broken back, and a crushed pelvis. He last saw Gleason professionally the day before the murder. Munns found that Gleason was continuing to improve, and he anticipated releasing Gleason to return to work after Gleason's appointment in November. An SRS worker who provided Gleason cash, medical services, and food stamps because of his injuries testified he was in pretty bad shape, but hobbled to her office in July 1999.

After the jury convicted Gleason of felony murder on August 2, 2002, his attorney, John Kurth, filed a motion for new trial and judgment of acquittal. Gleason added a pro se amendment which, among other things, alleged Kurth's conflict of interest and his ineffective assistance of counsel based upon deficient performance. Kurth filed a response, to which Gleason filed a pro se rebuttal. Gleason also filed two pro se motions for new counsel and re-

quested a continuance of the September 5, 2002, sentencing hearing to allow new counsel time to prepare. He also filed a K.S.A. 60-1507 motion, again alleging ineffective assistance of counsel. On August 20, the court appointed legal counsel Micheal Ireland to represent Gleason on his pro se motions. Gleason then filed a pro se motion on September 4 for a durational departure from his sentence because of the disparity in sentences among himself, Cady, and Bennett.

All motions were considered and denied by the district court at a hearing on September 5, 2002. The court then sentenced Gleason to life imprisonment, with no possibility of parole for 20 years. That same day, Kurth filed a notice of appeal to this court. On September 6, Gleason filed a pro se "Petition to reopen Investigation." On September 12, he also filed a pro se "Petition for Direct Appeal" asking the district court to notify him when Kurth filed his notice of appeal. On September 19, the district court appointed the appellate defender's office as Gleason's appellate counsel.

## ANALYSIS:

Issue 1: *Did the district court commit error when it gave an aiding and abetting instruction to the jury?*

Gleason raises a number of points in his brief regarding jury instructions, one of which he refined at oral arguments. His arguments can be condensed into two. First, the aiding and abetting instruction should not have been given because it allowed the jury to convict Gleason of felony murder even though he was not physically present at the scene of the crime and was not an "active participant." This erroneously allowed him to be convicted for merely buying the shotgun and loaning his car to Cady. Second, if an aiding and abetting instruction were appropriate to submit, then PIK Crim. 3d 54.06 (which requires foreseeability of the unintended crime of murder) should have been given, and PIK Crim. 3d 54.05 (which contains no foreseeability requirement) should not.

Gleason objected to the 54.05 instruction at the instructions conference but never asked for the 54.06 instruction. Different standards of appellate review therefore apply to each. See K.S.A. 2003

Supp. 22-3414(3). We need not apply the different standards, however, because we hold the proper instruction was given. See *State v. Ji*, 251 Kan. 3, 24-25, 832 P.2d 1176 (1992).

As we stated in *State v. Bryant*, 276 Kan. 485, Syl. ¶ 4, 78 P.3d 462 (2003):

"When reviewing challenges to jury instructions, we are required to consider all the instructions together, read as a whole, and not to isolate any one instruction. If the instructions properly and fairly state the law as applied to the facts of the case, and a jury could not reasonably have been misled by them, the instructions do not constitute reversible error even if they are in some small way erroneous."

Instruction No. 1, restating PIK Crim. 3d 56.02 for felony murder, provided:

"The defendant is charged with the crime of murder in the first degree. The defendant pleads not guilty.

"To establish this charge, each of the following claims must be proved:

"1. That Collin Cady killed Clarence Rinke;

"2. That such killing was done while in the commission of a burglary in which defendant was a participant; and

"3. That this act occurred on or about the 14th day of October, 1999, in Jefferson County, Kansas.

"The elements of burglary are as follows:

"1. Knowingly entering a building which is a dwelling;

"2. Doing so without authority; and

"3. Doing so with the intent to commit theft herein.

"The elements of theft are as follows:

"1. That Clarence Rinke was the owner of the property;

"2. That the defendant intended to obtain unauthorized control over the property;

"3. That the defendant intended to deprive Clarence Rinke permanently of the use or benefit of the property; and

"4. That the property had value."

Instruction No. 2, which restates PIK Crim. 2d 54.05 and is based upon K.S.A. 21-3205(1), provided:

"A person who, either before or during its commission, intentionally aids another to commit a crime with the intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

The remaining instructions were standard PIK Crim. 3d: No. 3 was the presumption of intent instruction (54.01); No. 4 was the

burden of proof, presumption of innocence, and reasonable doubt instruction (52.02); No. 5 was the credibility of witnesses instruction (52.09); No. 6 was the accomplice testimony instruction (52.18); No. 7 was the statements and arguments of counsel instruction (51.06); No. 8 was the rulings of the court instruction (51.05); and No. 9 was the concluding instruction (68.01).

## Purported requirement of physical presence and active participation

We first observe that Gleason's arguments assume that he was not at the scene of the crime. The State's evidence, however, primarily through the accomplice testimony of Cady and Bennett, amply demonstrated its primary theory, *i.e.*, that Gleason was physically present and was actively participating. He knowingly entered Rinke's house without Rinke's permission with the intent to commit theft. Accordingly, Gleason's purported requirement that his conviction depends upon his presence at the scene of the crime, *i.e.*, as a principal, has been satisfied; his arguments are moot. Under the State's facts, the jury properly convicted him of felony murder. See *State v. Chism*, 243 Kan. 484, 491, 759 P.2d 105 (1988) (irrelevant which appellant actually shot victim during the attempted burglary, as all participants to an underlying felony are principals to felony murder when death occurs).

Moreover, even assuming Gleason was actually at Johnny's Tavern at the time of the murder, the evidence also amply demonstrated the prosecution's alternate theory, *i.e.*, that he aided and abetted the burglary which resulted in Rinke's death. See K.S.A. 21-3205(1). According to accomplices Cady and Bennett, Gleason was the mastermind. He was the one who knew that Rinke, his marijuana dealer, had large amounts of drugs and money at his house. Indeed, he had previously discussed with Cooper a plan to rob Rinke somewhat similar to the one used in the instant case. Gleason furnished the car and purchased the shotgun that killed Rinke as well as the coveralls, gloves, and tote bag found near the scene. Phone records established that numerous calls were made between the cell phones belonging to Gleason on the date of the murder, particularly the evening when Rinke was actually shot. He

made a phone call to Rinke late in the afternoon on the day of the murder, ostensibly to return Rinke's cheap cooler he had been holding for over a year, but possibly to ensure that at the time of the burglary, Rinke would still be home to open his safe containing the money, marijuana, or both. He helped destroy evidence afterward, and twice threatened Bennett, first directly and later indirectly, to keep her mouth shut about the crime.

In short, there is sufficient evidence for a jury to find him guilty as either a principal or as an aider and abettor. Had the jury found that he did not physically participate in the burglary at Rinke's house or did not intentionally aid Cady to commit the burglary, it would not have found him guilty. Under these circumstances, the giving of the aiding and abetting instruction was not error. See *State v. Holt*, 260 Kan. 33, 44, 917 P.2d 1332 (1996) (though defendant charged as a principal in aggravated burglary, under the facts the jury could find him guilty as an aider and abettor; giving of the aiding and abetting instruction was not error); *State v. Parker*, 22 Kan. App. 2d 206, 208, 913 P.2d 1236, *rev. denied* 260 Kan. 1000 (1996) (in conviction of aggravated robbery, sufficient evidence that defendant was a principal and sufficient evidence he aided and abetted, therefore not error to give aiding and abetting instruction).

Nevertheless, Gleason argues that if the jury believed his testimony that he (1) was not physically present and (2) had merely loaned his car to his friend Cady and that his shotgun had been used in the crime, then the jury was misled by the instructions because as a matter of law he could not be convicted of felony murder as an aider and abettor.

We have found no cases addressing Gleason's specific argument that his absence prohibited a conviction of felony murder for aiding and abetting a crime upon which the murder charge was based. We have held in a nonfelony-murder case, however: "An aider and abettor does not have to be physically present when the crime is committed." *State v. Pratt*, 255 Kan. 767, 773, 876 P.2d 1390 (1994). *Cf. State v. Neil*, 203 Kan. 473, 474, 454 P.2d 136 (1969) (though defendant was not inside the building being burglarized,

he aided and abetted by serving as lookout and is punishable to same degree as principal).

Consistent with these cases, we observe no such "presence" requirement exists in the aiding and abetting statute. K.S.A. 21-3205, provides in relevant part:

"(1) A person is criminally responsible for a crime committed by another if such person intentionally aids, abets, advises, hires, counsels or procures the other to commit the crime.

"(2) A person liable under subsection (1) hereof is also liable for any other crime committed in pursuance of the intended crime if reasonably foreseeable by such person as a probable consequence of committing or attempting to commit the crime intended.

"(3) A person liable under this section may be charged with and convicted of the crime although the person alleged to have directly committed the act constituting the crime lacked criminal or legal capacity or has not been convicted of some other degree of the crime or of some other crime based on the same act."

Likewise, no such "presence" requirement exists in our current felony-murder statute. K.S.A. 21-3401 simply defines felony murder at subsection (b) as: "[T]he killing of a human being committed . . . in the commission of, attempt to commit, or flight from an inherently dangerous felony as defined in K.S.A. 21-3436 and amendments thereto." Burglary, the underlying crime in the instant case, is an inherently dangerous felony under K.S.A. 21-3436.

In short, there is nothing in the felony-murder statute or in the aiding and abetting statute which requires the aider and abettor of the underlying inherently dangerous felony to be physically present at the crime scene to be convicted of felony murder. See *State v. Hoang,* 243 Kan. 40, 45, 755 P.2d 7 (1988) ("There is nothing in our [felony-murder statute] on which to base such a distinction."). As mentioned, our aiding and abetting case law also reveals that no physical presence is required. Given these reasons and given the purpose of the felony-murder rule — to deter those engaged in dangerous felonies from killing negligently or accidentally by making all participants to the underlying felony principals — we reject such an argument. See *State v. Sophophone,* 270 Kan. 703, 706, 19 P.3d 70 (2001) (purpose is to deter those engaged in dangerous felonies from killing negligently or accidentally); *State v.*

*Chism,* 243 Kan. at 491 (all participants to the underlying felony are principals to felony murder when death occurs).

## Purported requirement of foreseeability of the murder

In the alternative, Gleason argues as a matter of law that Rinke's death had to be a foreseeable result of the burglary before he could be convicted of the felony murder. Accordingly, he alleges that if an aiding and abetting instruction had to be given, then PIK Crim. 3d 54.06, and not 54.05, should have been given.

PIK Crim. 3d 54.06, which is based upon K.S.A. 21-3205(2), states: "A person who intentionally (aids)(abets)(advises)(hires) (counsels)(procures) another to commit a crime is also responsible for any other crime committed in carrying out or attempting to carry out the intended crime, *if the other crime was reasonably foreseeable.*" (Emphasis added.)

We find *State v. Giddings,* 226 Kan. 110, 112-13, 595 P.2d 1115 (1979), on point. There, the defendant was convicted of felony murder, with robbery as the underlying felony. She was physically present during the robbery and victim's death but claimed she was merely an innocent bystander and her boyfriend was solely responsible. As here, the trial court gave an aiding and abetting instruction based upon PIK Crim. 3d 54.05, as previously set forth in the opinion, to which she did not object. It also denied her request to add the "foreseeability" aiding and abetting instruction based upon 54.06. Giddings claimed on appeal that the failure to give such an instruction deprived her of the defense of a lack of foreseeability that the murder might result.

This court rejected her argument, with a lengthy explanation, which stated:

"While it is true that foreseeability is a requirement to the application of the felony murder rule, this requirement is satisfied once it is determined that the felony is inherently dangerous to human life. This point was covered in *State v. Branch and Bussey,* 223 Kan. 381, 573 P.2d 1041 (1978):

" 'To apply the felony murder rule, it is only necessary to establish that defendants committed a felony inherently dangerous to human life and that the killing took place during the commission of the felony. (*State v. Guebara,* 220 Kan. 520, 523, 553 P.2d 296; *State v. Goodseal,* 220 Kan. 487, 553 P.2d 279.) A requirement of the felony murder rule is the fact the participants in the felony could reasonably

foresee or expect that a life might be taken in the perpetration of such felony. If applied to the facts of the present case, defendants are subject to the felony murder rule and it makes no difference that the killing was accidental.

" 'A felon's attempt to commit a robbery sets in motion a chain of events which should cause him to contemplate that a death might occur. This is particularly true of a robber who carries a deadly weapon (as these robbers did) and forces his way into an occupied dwelling. The impulse for an individual to resist the sudden show of force, to defend himself or to come to the aid of a family member or loved one, is a basic human instinct. Under such circumstances every robber who expects human opposition to his quest to steal, as he must when he commits a statutory robbery, is a potential assassin because he knows he may be forced to use his weapon either to carry out his criminal act or to escape without being pursued and captured by his victim. In a felony inherently dangerous to life the intent to accomplish the initial felony is transformed into malice and premeditation upon the death of a human being and the felon is guilty of first degree murder. . . .

. . . .

" 'We conclude that any participant in a life-endangering felony is guilty of first degree murder when a life is taken in the course of committing or attempting to commit the felony, whether the death was intentional or accidental, or whether the participant directly caused it to occur. (See *State v. Bey*, 217 Kan. 251, 535 P.2d 881; *State v. Turner*, [193 Kan. 189, 392 P.2d 863 (1964)]; *State v. Bundy*, 147 Kan. 4, 75 P.2d 236.)' (pp. 382-384.)" *Giddings*, 226 Kan. at 112-13.

The court went on to hold that since the evidence showed the defendant was more than an innocent bystander, *i.e.*, was a possible aider and abettor, "the court did not err in refusing to give the foreseeability instruction requested by appellant." 226 Kan. at 113.

Similarly, our facts demonstrate that Gleason was not an innocent bystander. As a result, there was no error in giving PIK Crim. 3d 54.05 to the jury and in not giving PIK Crim. 3d 54.06.

Likewise, in *State v. Chism*, 243 Kan. 490-91, this court upheld the district court's refusal of a similar instruction which expressed that one who was only an aider and abettor must have been able to reasonably foresee that a death would occur. We held that defendant Wenzel was equally responsible for co-felon Chism's fatally shooting the victim when Wenzel intentionally aided in the commission of the attempted burglary, stating: "[A]ll participants to an underlying felony are principals to felony murder when death occurs."

In short, *Giddings* and *Chism* are specific applications of the general rule: where the underlying felony is one inherently dangerous to human life, such as a burglary, the foreseeability requirement is established as a matter of law. See *State v. Stephens,* 266 Kan. 886, 893-94, 975 P.2d 801 (1999). Furthermore, since we stated in *Sophophone,* 270 Kan. 707, that a purpose of the felony-murder rule is to relieve the State of the burden of proving premeditation, any purported need to show the murder was also "reasonably foreseeable" is eliminated.

We acknowledge Gleason's point at oral argument that this court, over defendant's trial objection, actually approved the use of 54.06 in the felony-murder case of *State v. Pink,* 270 Kan. 728, 20 P.3d 31 (2001). See *State v. Bryant,* 276 Kan. at 491-95 (using 54.06 was not clearly erroneous in felony-murder case). Nevertheless, we hold that while approved, that instruction — although necessary to hold a defendant responsible for aiding and abetting other crimes that are foreseeable — is not necessary for a murder conviction based upon aiding and abetting an inherently dangerous felony under our decision today and in our prior decisions in *Giddings* and *Chism.*

We also acknowledge the existence of certain language in *State v. Kaiser,* 260 Kan. 235, 242, 918 P.2d 629 (1996), which could suggest that reasonable foreseeability in an aiding and abetting case is a requirement for murder based upon an inherently dangerous felony. We repudiate any language appearing in these cases and others which expresses, directly or indirectly, that a death must be foreseeable from the commission of the underlying inherently dangerous felony to support a conviction for felony murder.

Finally, Gleason cites *Tison v. Arizona,* 481 U.S. 137, 95 L. Ed. 2d 127, 107 S. Ct. 1676 (1987), and *Revilla v. Gibson,* 283 F.3d 1203 (10th Cir. 2002), for his contention that the Eighth Amendment prohibits a conviction of felony murder as an aider or abettor. These cases, however, only provide that the imposition of the death penalty is unconstitutional for a conviction of felony murder as an aider or abettor. Since Gleason was not sentenced to death, these cases are not applicable.

Issue 2: *Did the prosecutor's purported violation of a motion in limine also violate Gleason's right to a fair trial?*

Gleason next contends that after seeking permission to use evidence of a prior burglary conviction against him, and having the request denied, the prosecutor violated the court's limine orders by deliberately injecting that same objectionable material into the trial. He argues this was calculated prosecutorial misconduct which violated his constitutional right to a fair trial and requires a reversal of his conviction and remand for new trial.

Gleason's factual assertion is not entirely accurate. The motion in limine filed by the State sought to introduce evidence under K.S.A. 60-455 of Gleason's prior conviction of possession of stolen property — which was, however, the product of plea negotiations after he was originally charged with burglary stemming from an incident in November 1998. After hearing oral arguments, the district court denied the State's motion "to admit evidence of a prior crime."

Later, at trial the following exchange occurred during the State's direct examination of Gary Rogers:

| | |
|---|---|
| "[MR. BRADEN]: | Now, y'all, back in February '98 through July '98 you and Clarence, or excuse me, you and the defendant were doing some things together; correct? |
| "[MR ROGERS]: | Yes, we were. |
| "[MR. BRADEN]: | What was that? |
| "[MR ROGERS]: | We would scope out places. We'd go different places and get things, items that he, Noah felt what he needed. |
| "[MR. BRADEN]: | So what did you do? |
| "[MR. ROGERS]: | *We broke into places and got things he needed.* |
| "MR. BRADEN: | *What was the attitude of the defendant about the burglaries?* |
| "MR. ROGERS: | If you set the stage — |
| "MR. KURTH: | Excuse me, can we approach on this one? |
| "MR. KURTH: | Judge, I've let this go but I think we're talking about prior acts of misconduct that don't have any relevance to this case at all. It hasn't been talked about beforehand. There was no motion filed regarding previous acts. |
| "THE COURT: | That's true. |
| "MR. KURTH: | I'm objecting to it. |
| "THE COURT: | Where we going? |

"MR. BRADEN:    Judge, it was basically scoping out, it goes to plan.
"THE COURT:    Well, I know, but you can't introduce that without —
"MR. BRADEN:    I'm not introducing it, I'm, just the scoping out part. I will limit, I'll try to limit it.
"THE COURT:    *I don't think you can go into prior bad acts or anything.*
"MR. KURTH:    Judge, I'm going to ask that it be stricken.
"MR. BRADEN:    Judge, the issue was scoping out. He went a little bit beyond that.
(End of bench conference.)
"THE COURT:    Back on the record. Mr. Kurth, your objection is sustained. Ladies and gentlemen of the jury, you should disregard the last two answers that the witness made regarding, I think the term was scoping out or something, if I recall.
"MR. BRADEN:    *Judge, I think the objection was to the burglary itself.*
"THE COURT:    *Well, burglary and scoping things out. That has been stricken from the record and should not be considered along with the other evidence and testimony in the case.* You may proceed, counsel.
"MR. BRADEN:    *Gary, when these events were occurring what was the attitude of the defendant?*
"MR. ROGERS:    *If you set the stage properly, that you had a 95 percent chance of getting away free.*
"MR. KURTH:    Here we're going again, Judge. Same objection.
"THE COURT:    The objection is sustained. Let's move on, counsel."
(Emphasis added.)

We articulated our general standard of review regarding purported violations of motions in limine in *State v. Douglas*, 274 Kan. 96, 109, 49 P.3d 446 (2002):

"While it is true that an order in limine excludes evidence that, if admitted, would tend to prejudice the jury, it is not true that a violation of the order always results in prejudice that cannot be cured. We employ a two-part test to evaluate alleged violations of a motion in limine: (1) Was there a violation of the order in limine and (2) if the order in limine is violated, did the testimony substantially prejudice the defendant? The burden is on the defendant to show substantial prejudice. *State v. Galloway*, 268 Kan. 682, 692-93, 1 P.3d 844 (2000)."

We first ask whether there was a violation of the order in limine. The order prohibited introducing evidence of a prior crime. Although Gleason's conviction for possession of stolen property was never mentioned, the State elicited testimony that Rogers and Gleason scoped out places, broke into them, and took items from

those places. The State specifically asked about Gleason's attitude "about the burglaries," clearly prior criminal behavior. After the district court sustained Gleason's initial objection, the State continued to elicit testimony that Gleason had plotted the best way to get away with stealing these items. We hold the order was violated.

We must next determine whether the testimony substantially prejudiced Gleason. When the violation of the motion is based upon a defendant's allegation of prosecutorial misconduct, as here, (as contrasted with less culpable conduct) the analysis includes additional factors:

"In order for prosecutorial misconduct to constitute reversible error, the error must be of such magnitude as to deny a defendant his constitutional right to a fair trial. *State v. Pabst*, 268 Kan. 501, 504, 996 P.2d 321 (2000). Three factors should be considered in determining whether to grant a new trial because of a prosecutor's violation of an order in limine. First, was the prosecutor's misconduct so gross and flagrant as to prejudice the jury against the defendant? Second, does the admission of the statement indicate ill will by the prosecutor? Third, is the evidence against the defendant so overwhelming that there was little or no likelihood the prosecutor's violation of the order in limine changed the result of the trial? *State v. Crume*, 271 Kan. 87, Syl. ¶ 11, 22 P.3d 1057 (2001)." *State v. Bloom*, 273 Kan. 291, 301, 44 P.3d 305 (2002).

As for the first two factors, gross and flagrant misconduct and prosecutorial ill will, we again observe that though the State's motion in limine had been denied, the State twice attempted to introduce evidence regarding burglaries and defendant's attitude about them. The latter effort, though weaker than the earlier, is still of concern because it occurred immediately after the court had sustained the first objection and had instructed the jury to disregard the objectionable elements of the testimony. See *Douglas*, 274 Kan. at 108 (noting that ill will can be found when prosecutor ignores prior, sustained objection).

As for the third factor, likelihood that the violation of the order in limine changed the result of the trial, we observe that the repeated questioning certainly could have led the jury to believe that because Gleason had participated in burglaries before, he probably participated in this burglary as well. Gleason claims that the evidence against him was weak enough that the prosecutor's misconduct did prejudice the jury against him.

The State responds that Gleason was convicted on direct and overwhelming evidence. Based upon the facts previously set forth in the opinion, we agree with the State.

Our decision is also influenced by the fact that the objections were sustained, the jury was admonished to disregard the damaging testimony, and that Gleason did not ask for a mistrial because of the prosecutor's conduct.

*State v. Moncla*, 262 Kan. 58, 69-70, 936 P.2d 727 (1997), is of guidance. While not involving violation of a motion in limine, it does involve a similar allegation. Moncla argued the State deliberately introduced inadmissible evidence, thereby depriving him of his constitutional right to a fair trial. We disagreed, stating among other things that "[w]e will not 'find reversible error when an objection to a prosecutor's question or statement has been sustained,' *State v. Pioletti*, 246 Kan. 49, 67, 785 P.2d 963 (1990), unless the remarks were so prejudicial as to be incurable. *State v. Pursley*, 238 Kan. 253, 265, 710 P.2d 1231 (1985)."

Moreover, the general rule is that an admonition to the jury normally cures the prejudice from an improper admission of evidence. *State v. Navarro*, 272 Kan. 573, 582, 35 P.3d 802 (2001) (court admonished jury to disregard testimony elicited in violation of motion in limine). Accordingly, where the trial court sustains an objection and admonishes the jury to disregard the objectionable testimony, reversal is not required unless the remarks are so prejudicial as to be incurable. *Cf. State v. Foster*, 259 Kan. 198, 211, 910 P.2d 848 (1996).

In short, Gleason has not met his burden of showing the prosecutor's error was so prejudicial as to be incurable. Specifically, the evidence of Gleason's guilt was so overwhelming there was no likelihood the violation of the order in limine changed the trial result. Consequently, he was not denied his right to a fair trial.

Issue 3: *Did Gleason receive effective assistance of counsel through trial?*

Gleason raises several general claims of ineffective assistance of his trial counsel, John Kurth. First, he alleges performance errors such as failure to prepare for trial, to ask questions of witnesses at

trial, to object to the introduction of threatening letters written by Gleason, to object to the State's implication that Gleason's alibi was manufactured at the last minute, and to object to the introduction of Gleason's cell phone records. Second, he claims ineffective assistance based upon conflict of interest because Kurth was employed as an assistant Atchison County Attorney at the time of his appointment to represent Gleason in Jefferson County. Our standards for reviewing the two categories of claims, though somewhat alike, also contain some fundamentally different elements.

## Performance

Our standard of review for Gleason's first claim of ineffective assistance, *i.e.*, performance errors, is well recognized:

"A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984).

This court adopted these standards in *Chamberlain v. State*, 236 Kan. 650, 656-57, 694 P.2d 468 (1985), stating:

"[W]e deem it appropriate to now adopt the *Washington* holdings as the prevailing yardstick to be used in measuring the effectiveness of counsel under the Sixth Amendment. They may be stated as:

"*First*: The Sixth Amendment right to counsel is the right to the effective assistance of counsel, and the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

"*Second*: A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or setting aside of a death sentence requires that the defendant show, first, that counsel's performance was deficient and, second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial.

"(a) The proper standard for judging attorney performance is that of reasonably effective assistance, considering all the circumstances. When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness. Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.

"(b) With regard to the required showing of prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. A court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."

The defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Strickland,* 466 U.S. at 690-91. Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable, and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. *Strickland,* 466 U.S. at 690-91. The defendant bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy. *Ferguson v. State,* 276 Kan. 428, 446, 78 P.3d 40 (2003).

Once a proper determination of the issue of claimed ineffective assistance of counsel has been made by the trial court, the scope of review by the appellate court is to review de novo the trial court's analysis of the performance and prejudice components, which are mixed questions of fact and law. *Ferguson,* 276 Kan. at 436 (citing *State v. Rice,* 261 Kan. 567, Syl. ¶ 16, 932 P.2d 981 [1997]). Accordingly, once a district court has entered findings of fact and conclusions of law on the claim, an appellate court determines " 'whether the decision reached by the trial court follows as a matter of law from the facts stated as its basis, and also whether the

facts so stated have substantial support in the evidence.'" *Ferguson,* 276 Kan. at 445.

The district court appointed Micheal Ireland to represent Gleason on his posttrial pro se motions, including ineffective assistance of counsel, while not releasing Kurth from Gleason's representation. At the September 5 hearing on the motions, Gleason essentially informed the court he wanted Ireland to replace Kurth for all posttrial purposes. Ireland called Kurth to testify as his only witness, who was then cross-examined by the State. At the close of the evidence, the court denied the motions:

"Based upon the evidence and testimony the Court finds that the defense motion to set aside the trial or reverse the conviction on the basis on ineffective assistance of counsel should be and is denied. The Court finds that Mr. Kurth is a qualified member of the bar and member of the indigent defense panel. He has extensive service and experience in, representing defendants in trials of this type as well as prosecution trials of this type. I presided over the hearing, the trial, and in this Court's view, the, defense that Mr. Kurth provided was professional, adequate, and thorough to the extent that was possible under the actual circumstances that surrounded the trial of the case. As I recall I think, Mr. Kurth even commented that he went out and, this was in one of the motion hearings, I believe, that he, went out to the scene and went through the forest and the jungles and retraced the steps and timed the time that it took to make it from one place to the other and everything. This Court indicates a thorough investigation and effort to secure all litigating or [exculpatory] evidence which might have been used to assist in the defense of the case. The, as I said the ineffective assistance of counsel argument and motion is denied."

We now turn to evidence regarding Gleason's specific allegations of deficient performance.

*Failure to prepare for trial*

Gleason contends that Kurth did not have ample time to prepare for trial, as evidenced by his failure to have vital witnesses subpoenaed in time to testify at trial. At the September 5 hearing, Kurth testified that Gleason had given him a long list of witnesses to subpoena for the preliminary hearing. He did not subpoena those witnesses because he was using the preliminary hearing only to hear the State's evidence and tie the State's witnesses to a certain story. For trial, Kurth did subpoena certain witnesses, but released

one because of the negative tone of letters that Gleason had written to her.

Kurth subpoenaed two doctors, both of whom tried to quash the subpoenas. In the end, Dr. Munns, Gleason's orthopedic surgeon, testified and established the foundation for admitting into evidence all of Gleason's important medical records. Additionally, two physical therapists from Lawrence testified. Approximately 2 weeks before the trial began, Kurth filed a motion to continue because some of the doctors were unavailable. Gleason objected to the motion, so Kurth withdrew his motion.

We conclude Gleason has not met his *Strickland* burden of showing Kurth's performance was deficient, *i.e.*, that Kurth failed to prepare for trial. The evidence offered by Gleason actually supported Kurth's claim of effectiveness. We therefore need not consider the second *Strickland* factor which requires Gleason to show how this allegedly deficient performance prejudiced his defense so as to deprive him of a fair trial.

*Failure to ask witnesses specific questions*

Gleason next contends that Kurth was ineffective for failing to ask witnesses questions that Gleason wanted asked. Kurth testified that he did ask some of the requested questions but did not ask others because he was not going to ask a question to which he did not know the answer. Once at Gleason's prompting, Kurth asked Gleason's daughter, Alyssa, whether she knew that her dad would not hurt her. She said that she was not sure after she received a letter from Gleason.

A letter was mailed on July 29, 2002, several days before trial started, which was addressed to "Mom and Alyssa Gleason." It read in part:

"I will call some people who will line this shit out. Don't make me. I'm not playing any more games. I will do what I need to make sure Dianne is all right and gets what she needs. So give her the stuff, all of it you took. Don't make the wrong choice. No games. I ain't playin.' You don't want to play with my friends, if, if have to have them come and collect my things I will tell them to go—I will tell them to through Dianne. No joke. You are not the owner of my stuff. My wife can take care of me, if you just want to make things harder. I'd like your help. Be either with me or not but don't mess with my wife or I will send hell down. You

know I know them. Back off. Dianne Gleason, my wife, don't forget. And I want the deed signed over to Noah and Dianne, Alyssa and Derek Gleason. You can't do anything with the place anyway with the liens on it."

Alyssa had taken a Honda automobile, a pickup truck, a mower, a motorcycle, and a 1959 Chevy without telling Gleason.

Again, Gleason does not meet his *Strickland* burden of showing that Kurth's performance was deficient, *i.e.*, for not asking witnesses specific questions. The examination of witnesses typically is a matter within the reasonable professional judgment of trial counsel. We therefore need not consider the second *Strickland* factor — how allegedly deficient performance prejudiced his defense so as to deprive him of a fair trial.

*Failure to object to cell phone records, letters, and prosecutor's alibi argument*

The State introduced Gleason's cell phone records without Kurth's objection. This specific allegation of ineffective assistance of counsel was not preserved at the district court, either at trial or the September 5 hearing. It cannot be considered now. See *Dalmasso v. Dalmasso*, 269 Kan. 752, 765, 9 P.3d 551 (2000); *State v. Van Cleave*, 239 Kan. 117, 119, 716 P.2d 580 (1986) (an allegation of ineffective assistance of counsel will not be considered for the first time on appeal where the district court has not had the opportunity to conduct the factual inquiry).

Letters were also introduced into evidence. They are not part of the record on appeal, and only portions of those letters were read into the record, two of which are quoted in this opinion. Furthermore, Gleason does not specify what elements in the letters he finds probative of Kurth's ineffectiveness as required by *Strickland*, 466 U.S. at 490-91.

At the September 5 hearing, Kurth testified that he received the letters to Gleason's daughter and mother around 10 o'clock the night before the trial started. He spoke with Gleason about the letters, telling him that they could deal with the letters during the trial because the letters were not solely aimed at threatening his mother and daughter but also encouraged them to tell the truth. Kurth and another attorney had earlier advised Gleason to not

communicate with anyone and to not write letters to anyone. Gleason did not follow this advice and wrote approximately 113 pages of correspondence and notes.

One letter was quoted previously in the opinion. The other read in part:

"Also I say again in case you don't get the note remember Collin calling in the night and waking us up and when he was yelling at Grandma's house, also remember the money I had in cash, $10,000, and the money from the house we used to build the new one. Also Collin is a drug head and is always using me. Tell Mark [Alyssa's boyfriend] I'll need him to testify to all this, too, and he can have the 25 caliber gun for all his help. Just remember all the things that are important, think about all, and you don't know anything about Clarence [Rinke] and drugs if you're asked, and that I have any involvement with them."

Another portion of the same letter read:

"I'll get out, there is way too much doubt. If you remember, I was in very bad shape when this happened, I was in therapy, in fact, you know that my lawyer has a bunch of proof that I was not involved with Collin being arrested and all that, Collin and Charolette's stories don't match, and my condition, plus I had money. Clarence was my friend. It all points to them using me. You'll see."

The same letter continued:

"Dianne is the girlfriend they saw me with, at Johnny's with. I was seeing Dianne all right, she is the Dianne and she was getting a divorce so we didn't want anyone to know, but she was with me, making it impossible for me to do what they say, what they are trying to use me for. You take care of her. She is taking care of your father. I don't give a damn if she takes—I don't—even if takes— oh, if she takes the whole f'ing house, let her. In fact, help her. I need that girl."

Gleason was also originally charged with criminal threat, which was dropped after the state's case in chief. These letters, primarily the one quoted previously in the opinion, are relevant to that charge and would be admissible over Kurth's objection even if he had made one.

Gleason also claims the State implied during its closing argument that Gleason's alibi was manufactured at the last minute. He does not specify, however, which statements are objectionable. See *Strickland*, 466 U.S. at 490-91. We are unable to independently find such an implication in the State's closing statement. Kurth testified at the September 5 hearing that a witness came forward

to say that she was the girl in the reports at Johnny's Tavern with Gleason. Kurth reviewed this with Gleason and his wife and recommended as a matter of trial strategy that they not divulge the alibi witness right away. Instead, Kurth provided the State the minimum notice under the statute regarding the alibi witness. See K.S.A. 38-1623.

Based upon the limited information Gleason provides us, we conclude he fails to show Kurth's performance was deficient when Kurth failed to object to the letters and to the alleged statements during closing arguments. We therefore need not consider the second *Strickland* factor.

In summary, we review the district court's determination of the issue of claimed ineffective assistance of counsel as a mixed question of fact and law. We agree with the court's determination because it follows as a matter of law from the findings which have substantial support in the evidence. See *Ferguson,* 276 Kan. at 445.

Conflict of interest as a prosecutor

Gleason also argues ineffective assistance of counsel because Kurth was an assistant Atchison County Attorney during the first 2 months of his representation. He essentially alleges this is a conflict per se. See *Wood v. Georgia,* 450 U.S. 261, 271, 67 L. Ed. 2d 220, 101 S. Ct. 1097 (1981) (where a constitutional right to counsel exists, there is a correlative right to representation that is free from conflicts of interest).

Kurth testified at the September 5 hearing that he was appointed to represent Gleason on April 3, 2002, and terminated his employment with Atchison County on June 1, 2002. Gleason's trial began July 31, 2002. Kurth testified he believed he told Gleason that he was a prosecutor in Atchison County but acknowledged that there might have been a miscommunication between them on that issue.

Through Gleason's pro se pleadings, the district court in the instant case was aware of the potential conflict and held a hearing on the ineffective assistance of counsel issue. Although the district court denied Gleason's motion, it did so on the basis of attorney performance. It did not make a determination regarding any con-

flict of interest. Rather than remand, we have sufficient evidence before us to make the determination. See *State v. Jenkins*, 257 Kan. 1074, 1080, 898 P.2d 1121 (1995) (We have considered the record in this case and determine that all facts necessary for resolution of the conflict of interest issue are contained in the record. Under these circumstances, remand would serve no useful purpose.).

As mentioned, claims of ineffective assistance of counsel based upon conflict of interest are analyzed somewhat differently from those which are based upon deficient performance. See *Mickens v. Taylor*, 535 U.S. 162, 166, 152 L. Ed. 2d 291, 122 S. Ct. 1237 (2002). The analysis of the former generally depends upon whether defendant objected at the trial court.

The United States Supreme Court has held that where defense counsel is forced to represent codefendants over his or her timely objection, reversal is automatic (unless the trial court has determined that there is no conflict). *Mickens*, 535 U.S. at 167-68 (interpreting *Holloway v. Arkansas*, 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173 [1978]).

On the other hand, in general, "absent objection, a defendant must demonstrate that a 'conflict of interest actually affected the adequacy of his representation.' " *Mickens*, 535 U.S. at 168 (citing *Cuyler v. Sullivan*, 446 U.S. 335, 348-49, 64 L. Ed. 2d 333, 100 S. Ct. 1708 [1980]). However, this does not rise to the level of the *Strickland* test which requires "a showing of probable effect upon the outcome of the trial." *Mickens*, 535 U.S. at 174; see *State v. Jenkins*, 257 Kan. at 1088 (defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief).

Here, Gleason's motions essentially objected to Kurth's representation because of, among other things, conflict of interest. "But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Jenkins*, 257 Kan. at 1083 (citing *Cuyler v. Sullivan*, 446 U.S. at 348-50).

The case of *State v. Wallace*, 258 Kan. 639, 908 P.2d 1267 (1995), is of guidance. There, we held there was no conflict of interest when defense counsel served as a special prosecutor for

Bourbon County while simultaneously representing Wallace in Bourbon County, *i.e.*, "a defense attorney was acting as a temporary prosecutor in the court in which he was defending his client." 258 Kan. at 650. Consequently, there was no violation of defendant's constitutional right to effective assistance of counsel. The *Wallace* court cited *State v. Rice*, 227 Kan. 416, 607 P.2d 489 (1980), where we found no actual conflict of interest to preclude representation of a defendant on state criminal charges by a court-appointed attorney whose law partner served as a part-time judge of the municipal court in the same city. As we stated in *Rice*:

"Ordinarily, a part-time judge or prosecutor would not be precluded, on a basis of conflict of interest, from representing defendants in criminal cases in other courts. The same is true of the law partners and associates of such public servants. Obviously, none of such persons should represent a defendant in the court in which the judge or part-time city or county attorney carries out his or her duties. Nor should any such lawyer represent a defendant in an appeal from a decision of the inferior court. . . . In the last analysis the decision of whether a conflict of interest is actually present . . . is one to be determined by the judge and counsel on an individual basis. Lacking any such actual conflict or appearance of impropriety, we do not believe the attorney should be precluded from the representation." 227 Kan. at 421-22.

The *Wallace* court also cited *Widener v. State*, 210 Kan. 234, 499 P.2d 1123 (1972), where a K.S.A. 60-1507 movant argued his convictions were voided by his appointed defense counsel's conflict of interest because counsel also served as probate judge in the same county. We rejected this argument, holding: "An accused is not denied the effective assistance of counsel guaranteed by the constitution merely because the attorney appointed to represent him holds the office of probate judge of Cowley County, Kansas." 210 Kan. at 237.

Our Court of Appeals relied upon *Wallace* in *State v. Mitchell*, 30 Kan. App. 2d 1090, 54 P.3d 969 (2002). There, defendant argued his counsel had a conflict of interest because at the time of his hearing under *State v. Ortiz*, 230 Kan. 733, 640 P.2d 1255 (1982), to determine whether he waived his appellate rights, counsel was the current Sherman County Attorney. The hearing was held in Sherman County, and another attorney appeared as acting county attorney. Citing *Wallace*, the court held: "The fact that Sel-

bey [defense counsel] was an assistant or the actual county attorney at the time of the *Ortiz* hearing does not in itself establish an ineffective assistance of counsel claim." 30 Kan. App. 2d at 1096.

We conclude that merely because Kurth served for the first 2 months of his representation of Gleason as an assistant county attorney in Atchison, a county which adjoins Jefferson, there was no actual conflict of interest. Gleason has not met his constitutional predicate under *Cuyler v. Sullivan*, and therefore was not denied effective assistance of counsel. In so holding, we also note the fact that a conflict of interest under either the Code of Professional Responsibility or the Model Rules of Professional Conduct may exist is not dispositive of whether a client had ineffective assistance of counsel in a criminal proceeding. See *Mickens*, 535 U.S. at 176; *Wallace*, 258 Kan. at 646.

Issue 4: *Did trial counsel have a conflict of interest which prohibited his representation of Gleason at the sentencing hearing?*

After Kurth's testimony at the September 5 hearing concerning Gleason's posttrial motions alleging ineffective assistance of trial counsel, the presentation of Ireland (Gleason's "pro se motions" attorney) concluded. Following the court's finding that Kurth had done a thorough and competent job of representing Gleason and its denial of the motions, the court inquired if Gleason had any other issues that he wanted to bring to the attention of the court. Gleason essentially stated they had been covered. The following exchange then occurred:

"COURT: Okay. Well then let's move on to the motion for duration and departure. I don't know, is this pro se motion or is this?

"MR. KURTH: Judge, I can argue that one, because I would have done it also had I realized or thought I was going to be involved in it, Judge, but I'm, I'm certainly comfortable doing it.

"COURT: You're lead counsel in the case, so I want you. Say, Mr. Ireland, you're excused, thank you."

Kurth then argued Gleason's pro se motion for durational departure based upon the identical reasons contained in the motion, *i.e.*, his sentence should be no greater than his accomplices' sentences because his participation in the crime was no greater, and

possibly less. The court then denied the motion and sentenced Gleason to life with parole eligibility in 20 years.

Although the district court properly denied Gleason's motions that claimed ineffective assistance based upon deficient performance, and this court today holds Kurth had no conflict by virtue of his earlier position as assistant Atchison County Attorney, Gleason essentially argues on appeal that his act of filing the motions, and the court's conducting a hearing on the issue at which Kurth testified, independently created another conflict of interest for Kurth. Consequently, Kurth should not have been allowed to represent Gleason at the subsequent sentencing hearing. Because of Kurth's purported second conflict, Gleason claims entitlement to a new sentencing proceeding at which he is represented by conflict-free counsel.

Gleason did not raise this argument to the district court at any time. Neither did any of the attorneys at the district court level — the prosecutor, Ireland, or Kurth — raise the concern that such a second conflict of interest existed. Furthermore, the trial court did not independently raise the issue nor make an inquiry as to this potential claim. On appeal, Gleason not only argues that the conflict was clear, but also seems to suggest that the trial court's mere failure to inquire into the potential conflict requires a reversal of the sentencing.

*Mickens v. Taylor,* 535 U.S. 162, provides guidance. There, a murder defendant was defended by appointed counsel who also was representing the victim on criminal charges at the time of the murder. The trial court conducted no inquiry on the potential conflict. Following defendant's conviction in state court and the Virginia Supreme Court's affirmation, he brought a habeas corpus petition in United States District Court alleging ineffective assistance of counsel because of counsel's conflict of interest. The federal district court conducted an evidentiary hearing and denied the petition, which was affirmed by the Fourth Circuit Court of Appeals.

The Supreme Court noted "that the only question presented was the effect of a trial court's failure to inquire into a potential conflict upon the [*Cuyler v. Sullivan,* 446 U.S. 335] rule that deficient

performance of counsel must be shown." 535 U.S. at 174. It held that under such circumstances, the *Sullivan* rule would apply, *i.e.*, when the state trial court fails to inquire into a potential conflict, the defendant still must "establish that the conflict of interest adversely affected his counsel's performance." 535 U.S. at 174. The Court recognized that the Fourth Circuit, after reviewing the district court's record of the evidentiary hearing, had found no such effect and affirmed the denial of the habeas relief.

In the instant case, no factual inquiry was conducted. However, as with the conflict of interest allegation in issue 3, we have sufficient record before us to make a determination and need not remand. See *State v. Jenkins*, 257 Kan. at 1080. Neither do we need to decide whether any degree of the purported conflict of interest is present because Gleason has not shown, and cannot show, his counsel's performance was adversely affected. *Mickens*, 535 U.S. at 172 n. 5 ("An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance."). More particularly, he cannot show Kurth's performance at sentencing was adversely affected when Kurth's oral arguments were entirely based upon Gleason's own motion for durational departure.

Gleason mentions in passing that Kurth was ineffective at sentencing because he failed to give the district court any authority for considering his accomplices' sentences, or for considering a downward departure, which he alleges the court was required to do in this case, citing *State v. Bailey*, 251 Kan. 527, 531, 834 P.2d 1353 (1992).

*Bailey* is inapposite. There, the defendants were convicted of identical counts: four counts of aggravated robbery and one count of first-degree felony murder. One defendant was sentenced to 15 years to life for two of the aggravated robberies and one term of life for first-degree felony murder. He also received two sentences of 15 years to life on the remaining two counts, but the sentences were to be served concurrently, allowing the first defendant to be eligible for parole after 30 years. The other defendant was given the identical length of sentence for each offense, but the sentences were to be served consecutively, allowing him to be eligible for

parole after 45 years. This court simply stated that under such circumstances, the trial court is not bound to sentence a codefendant to an identical sentence, but erred in not considering the disparity. "The trial court . . . must consider the sentence given the codefendant and, if a longer sentence is given, the reason for doing so should be set forth on the record." 251 Kan. at 531.

By contrast, Gleason was convicted by a jury of first-degree felony murder — an off-grid felony punishable by life in prison — while, according to the parties' briefs, Cady pled guilty to second-degree murder and Bennett pled guilty to conspiracy to commit armed robbery, both of which are less serious and grid offenses. Accordingly, there is no requirement that the district court give reasons for pronouncing different sentences for different crimes. See *State v. Davis*, 256 Kan. 1, 34, 883 P.2d 735 (1994); *State v. Castoreno*, 255 Kan. 401, 413-14, 874 P.2d 1173 (1994); *State v. Parker*, 22 Kan. App. 2d 206, 211, 913 P.2d 1236 (1996).

We are unaware of any requirement that Kurth should have provided to the district court the remaining information Gleason alleged, and he cites no authority. See *McCain Foods USA, Inc., v. Central Processors, Inc.*, 275 Kan. 1, 61 P.3d 68 (2002) (Simply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue; where appellant fails to brief an issue, that issue is waived or abandoned.).

Though several of Gleason's pro se motions also asked for the appointment of new counsel, on appeal he has framed his argument somewhat differently, choosing instead to concentrate on the allegation of ineffective assistance. Nevertheless, we observe that absent Kurth's actual conflict of interest, Gleason would be required to demonstrate the district court abused its discretion in failing to appoint new counsel for his sentencing hearing. *Cf. State v. Jasper*, 269 Kan. 649, 8 P.3d 708 (2000) (whether the dissatisfaction of an indigent counsel with a court-appointed counsel warrants discharge of that counsel and appointment of new counsel is for the trial court, in its discretion, to decide, but irreconcilable conflict may, under certain circumstances, *require* the appointment of substitute counsel in order to protect a defendant's Sixth

Amendment right to effective assistance of counsel). He has not done so.

Issue 5: *Was Gleason's sentence appropriate?*

Gleason not only argues that Kurth was ineffective at his sentencing for failing to meet the mandate of *Bailey*, 251 Kan. at 530-31, he also argues the district court itself erred in not following *Bailey*. He claims the court erred in not considering his sentence in light of the lesser sentences received by his accomplices, and in not stating the reasons on the record for the disparity. Because of these failures, he argues his sentence should be vacated and his case remanded for resentencing.

As with the earlier argument regarding issue 4, the problem with Gleason's present argument is that both *Bailey* defendants were sentenced on identical counts. By contrast, Gleason was convicted of first-degree felony murder while Cady and Bennett pled guilty to less serious offenses. Accordingly, there is no rational basis for comparing their sentences, and therefore no requirement that the district court give reasons for pronouncing different sentences for different crimes. See *Davis*, 256 Kan. at 34; *Castoreno*, 255 Kan. at 413-14; *Parker*, 22 Kan. App. 2d 206, Syl.

Moreover, in denying Gleason's request for a downward departure, the court provided its reasons:

"The Court finds that it's in the discretion of the State and the prosecution to offer plea negotiations to obtain operations from defendants, co-defendants, and prosecution of crimes. This is a well settled principle in area of law and it is and has been found to be appropriate when necessary to make the (inaudible) justice, and this instance, two co-defendants entered pleas, Mr. Gleason chose to go to trial. And now having, undergone that endeavor wants to now go back into a what I would consider to be a secondary effort to plea negotiations on the basis of sentencing. This I think is not appropriate. Under the facts of the case, the evidence indicated that he was the, primary person who from the testimony of the co-conspirators or co-defendants, came up with the, plan, and to, if you would, managed or directed to a great extent the acts that occurred. It was he who had the contact with the victim, it was he who was familiar with the victim's home and I think it (inaudible) in the testimony was the fact that it was he that had knowledge that there may be, fruits there which would, result in his better (inaudible) if he was able to obtain them i.e. money and possibly drugs. For that reason the defendant's motion for a durational departure is denied."

Affirmed.