IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 105,183

STATE OF KANSAS,
*Appellee*,

v.

STEVE KELLY MOYER,
*Appellant.*

SYLLABUS BY THE COURT

1.

The Sixth Amendment to the United States Constitution guarantees that in all criminal prosecutions, the accused shall enjoy the right to have the effective assistance of counsel for his or her defense.

2.

The purpose of requiring that the constitutionally mandated assistance of counsel be effective assistance is simply to ensure that criminal defendants receive a fair trial. To fulfill the effective assistance function, counsel owes the client a duty of loyalty and a duty to avoid conflicts of interest.

3.

The Sixth Amendment right to counsel is made applicable to state proceedings by the Fourteenth Amendment to the United States Constitution.

4.

When a defendant claims a Sixth Amendment right to counsel violation based on his or her attorney's concurrent representation of another, the analysis starts with a determination of whether the defendant has established that his or her attorney had an active conflict of interest.

5.

Under the concurrent representation circumstance presented in this case, the defendant had the additional burden of demonstrating that his attorney's active conflict of interest actually affected the adequacy of the attorney's representation.

6.

When a criminal defendant claims a Sixth Amendment right to counsel violation based on his or her attorney's deficient performance, the defendant must satisfy a two-part test by proving: (1) counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived defendant of a fair trial. In other words, the defendant must show there is a reasonable probability the result would have been different but for counsel's errors.

7.

Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. But no prejudicial error may be found upon the cumulative effect rule if the evidence is overwhelming against the defendant.

Appeal from Sherman District Court; SCOTT SHOWALTER and GLENN R. BRAUN, judges. Opinion filed February 15, 2019. Affirmed.

*Robert A. Anderson, Sr.*, of Law Office of Donald E. Anderson II, LLC, of Ellinwood, was on the briefs for appellant.

*Natalie Chalmers*, assistant solicitor general, and *Derek Schmidt*, attorney general, were on the briefs for appellee.

PER CURIAM:  Steve Kelly Moyer's direct appeal returns to this court after a remand to the district court for a *State v. Van Cleave*, 239 Kan. 117, 716 P.2d 580 (1986), hearing to determine whether Moyer was denied his Sixth Amendment right to counsel, either because his trial counsel was not constitutionally conflict-free or was not constitutionally competent. *State v. Moyer*, 302 Kan. 892, 895, 935, 360 P.3d 384 (2015), *as modified in* 306 Kan. 342, 410 P.3d 71 (2017). When this court remanded the case for a determination of whether Moyer was provided effective assistance of counsel, it also reserved the question of cumulative error. We now determine that Moyer's convictions can be affirmed.

FACTUAL AND PROCEDURAL OVERVIEW

A detailed description of the sodomy and sexual intercourse underlying Moyer's five sex crime convictions is set forth in the opinions cited above. The victim was J.M., Moyer's oldest daughter, who testified to a pattern of sexual abuse that started when she was 11 years old and continued into her 14th year. In addition to that testimony, J.M. provided several items of corroborating physical evidence, including used condoms from sexual encounters with Moyer, an audio recording J.M. secretly made of one sexual encounter, a rag that J.M. had used to clean herself after sex acts with Moyer, and a notebook containing an agreement between J.M. and Moyer enumerating a points system

Moyer designed by which J.M. could ostensibly complete the sexual relationship with Moyer by performing sex with him according to certain rules.

During the trial, a problem arose getting an exculpatory witness to testify for the defense. While Moyer's attorney, Jeffery Mason, was serving as guardian ad litem for J.T. in a child in need of care (CINC) case, he learned that J.T. knew J.M. and her sister, H.M.; that J.T. was aware of J.M.'s sexual abuse allegations against Moyer; that J.M. and H.M. had told J.T. that the allegations against Moyer were false; and that J.T. was willing to testify in Moyer's criminal case. In our earlier opinion, we described the problems as follows:

> "Close to the trial date, Mason attempted to locate J.T. to subpoena her to testify, and he learned she was at the St. Catherine's Hospital psychiatric ward in Garden City. Mason discussed with Moyer the dangers of calling a witness suffering from mental problems, but Moyer said he still wanted J.T. to testify. After Mason contacted J.T. to assess her ability to testify and to determine the substance of her testimony, he subpoenaed her. But Mason was informed that J.T.'s doctor would not approve J.T. coming to Goodland to testify because she needed to go immediately to a residential psychiatric treatment facility.

> "Mason acknowledged the potential conflict of interest created because of his roles as J.T.'s guardian ad litem and Moyer's defense attorney, and he admitted to the court that he had not obtained a written waiver of conflict from either Moyer or J.T. But he nevertheless asserted: 'I don't believe that there's a conflict under the circumstances.' That assertion was followed by a discussion of submitting the testimony of an unavailable witness, in which Mason asserted that there would be 'an absolute conflict of interest if the question would be whether I would be presenting—presenting that evidence to the Court or to the jury. I can't do that because I'm Mr. Moyer's attorney, but the information that came to me came only to me.'

> "The State responded by pointing out that Mason had failed to advise the court about this potential conflict of interest at any of the earlier court hearings. Further, the

4

State argued that the potential conflict of interest was a secondary consequence of the defense counsel's failure to properly subpoena J.T." 306 Kan. at 381.

At that point, the trial court noted that J.T.'s subpoena was issued just that morning. The trial court gave Mason until the end of Moyer's trial testimony to determine whether J.T. was available to travel and competent and capable of testifying. The trial court held that if Mason could not show J.T.'s availability, the trial would continue without her, specifically declaring: "'Defense [counsel] has had an ample opportunity to prepare their case, that there has not been a subpoena issued prior to today's date, and that we're going to go forward and this case will be concluded and taken to the jury.'" 306 Kan. at 382.

After Moyer testified, the parties had another in-chambers conference regarding J.T.'s availability. This court's prior opinion stated the following facts:

"Mason explained that his law partner had spoken with a screening therapist at St. Catherine's who explained that a doctor informed the screening team that J.T. 'would be extremely unreliable in any testimony and would lack any credibility whatsoever.' The screening therapist could not tell the law partner whether J.T. was competent to testify. The therapist relayed that J.T. was being sent to a psychiatric residential treatment facility where she would not be free to leave and that they did not recommend that she be forced to testify.

"The court noted: 'It would appear then that the possibility of [J.T.] being capable of testifying is extraordinarily small, and even if she were, there's a question as to any value that her testimony would be given.' Mason told the court, 'That is exactly my assessment of it, Your Honor,' and asked for additional time to speak with his client about the matter.

"The court granted this request and after the conference, the following information was placed on the record:

'MR. MASON: . . . Although my client believes that the evidence that [J.T.] would testify to, as he understands it, would be beneficial to him based on what I've already put on the record, we have also expressed—discussed the fact that the information that we have from two different individuals involved in the screening processes, that her testimony today would be extremely unreliable and lack any credibility and that the State would have the opportunity to bring that to the jury's attention; and therefore, it would not be appropriate to use [J.T.'s] testimony today.'

"The court then had Moyer confirm that he understood what Mason had said and that he agreed with the decision to proceed. Moyer also told the court that he was satisfied with Mason's representation to that point. But the district court made no explicit finding with respect to whether a conflict of interest existed. Rather, . . . the judge said that he understood Mason's action, that Mason's past behavior had always been ethical, and that 'if there is a problem, then those problems will be dealt with by others.'" 306 Kan. at 382-83.

This court held that although the trial court inquired into the facts underlying the conflict of interest, it failed to make the determinations necessary for this court to assess what impact the conflict had on Mason's performance. For example, this court did not know whether Mason was still serving as J.T.'s guardian ad litem at the time of Moyer's trial. Further, this court had no findings from the district court as to Mason's failure to properly issue and serve a subpoena on J.T. forcing her appearance or regarding whether Mason should have preserved J.T.'s testimony in some manner. Therefore, this court remanded for a *Van Cleave* hearing to determine whether Moyer was denied his Sixth Amendment right to counsel. 306 Kan. at 383-85.

On remand, 15th Judicial District Chief Judge Glenn Schiffner granted Moyer's motion to disqualify or recuse Judge Scott Showalter, Moyer's trial judge, from presiding over the *Van Cleave* hearing. Chief Judge Schiffner assigned Chief Judge Glenn R. Braun

6

of the 23rd Judicial District to preside over the hearing. Actions taken with Judge Braun presiding will hereinafter be referred to as actions taken by the *Van Cleave* court, in order to distinguish these proceedings from actions taken by Judge Showalter during Moyer's jury trial.

The State filed a motion to clarify the scope of remand based upon Moyer's letters to district judges and counsel indicating his intent to inquire into matters the State argued were not subject to remand, including Mason's qualifications for appointment as Moyer's counsel and the trial court's denial of Moyer's pretrial motions for new counsel. According to the State, the following issues were subject to remand: (1) Was Mason still J.T.'s guardian ad litem at the time of Moyer's trial? and (2) if so, (a) was Mason's advice adversely impacted by his status as J.T.'s guardian ad litem? and (b) was Mason ineffective for failing to obtain J.T.'s presence at trial or otherwise preserve her testimony?

Notably, the State stipulated that the answer to the first question is "yes," Mason was J.T.'s guardian ad litem at the time of Moyer's trial.

Moyer's written response to the State's motion argued the remand was limited to the three issues discussed in this court's opinion, including whether the trial court denied him due process by failing to conduct a meaningful hearing on his pro se pretrial motions for new counsel. Moyer argued the following were relevant to Mason's conflict of interest and ineffectiveness: Mason's qualifications; Mason falsely reporting to the Board of Indigents' Defense Services (BIDS) a visit with Moyer in jail that did not take place; Mason's failure to withdraw as both Moyer's counsel and J.T.'s guardian ad litem when he first learned J.T. was a potential exculpatory witness; Mason's financial interest in continuing both cases; the failure to properly and timely subpoena J.T.; the failure to preserve J.T.'s testimony; and the failure to request a continuance in order to obtain J.T.'s testimony or make inquiries as to her mental health status.

7

The *Van Cleave* court ruled that the remand proceeding would cover two issues: (1) Did the conflict deprive Moyer of his Sixth Amendment right to effective assistance of counsel? and (2) if not, was Mason's performance so deficient that he denied Moyer his right to a fair trial? The *Van Cleave* court noted that much of what Moyer wanted to present might be relevant to cumulative error but might not be within the scope of this court's remand. In an effort to stay within the scope of the remand while still allowing Moyer to create a record for this court to consider for cumulative error purposes, the *Van Cleave* court permitted Moyer to proffer evidence related to Mason's qualifications.

Moyer's counsel stated he did not read this court's decision for the "remand and the *Van Cleave* hearing to be a full blown *Van Cleave*"; instead, "[i]t's clear that Mr. Moyer, . . . will still have the availability of relief under [K.S.A. 60-]1501 and [K.S.A. 60-]1507 at some time in the future, if that's necessary." Therefore, Moyer assured the *Van Cleave* court he would limit the issues at the *Van Cleave* hearing to those raised in his response to the State's motion to clarify. But the *Van Cleave* court allowed Moyer to preserve for appeal his proffer that Mason was not qualified under K.A.R. 105-3-2 to be court appointed on an off-grid felony, which deprived Moyer of his Sixth Amendment right to effective counsel.

Mason and Moyer were the only witnesses who testified at the *Van Cleave* hearing. The *Van Cleave* court took judicial notice of J.T.'s CINC case and corresponding Kansas Department of Social and Rehabilitation Services (SRS) agency records. J.T.'s records from St. Catherine's Hospital were admitted at a prior hearing, and the *Van Cleave* court also reviewed those in making its decision. Further, the *Van Cleave* court took judicial notice of the entire transcript of the jury trial and all trial exhibits.

The *Van Cleave* court issued written findings of fact and conclusions of law, which included the following facts:

8

"1.   Jeffery Mason was the GAL for J.T. in the CINC case during the time he represented Moyer.

"2.   Mason testified J.T. told him that Moyer's daughter, the victim in the criminal case, told J.T. the allegations against Moyer were false.

"3.   Mason conveyed this information to Moyer and it was agreed J.T. would be a witness for Moyer.

"4.   One week before trial, Mason knew the location on J.T. but did not issue a subpoena.

"5.   Mason testified that it was a strategic decision not to subpoena J.T. in advance of trial to keep the state from discovering or investigating J.T.

"6.   During the trial, Mason discovered that J.T. was in the psychiatric ward of St. Catherine's Hospital in Garden City, Kansas.

"7.   Mason faxed an unsigned subpoena to the hospital on the night of the third day of the trial.

"8.   After the hospital received the fax, conversations occurred regarding J.T. Mason and his law partner were told that J.T. had threatened suicide; was a danger to others; was an extreme flight risk; was on slight medication; was extremely unreliable and lacked credibility; and it would be detrimental to her health to testify.

"9.   Mason testified that he recognized a potential conflict when he learned the doctor for J.T. would not make her available to testify because she was not competent.

"10.  Mason told Moyer of these developments and let Moyer decide whether to proceed with the trial or request a continuance. Moyer told Mason he wanted to go forward without the testimony of J.T.

9

"11. During the trial, a recess was held in which Mason, in the presence of Moyer, revealed J.T.'s medical information to the judge and Mason's possible conflict of interest. The judge inquired of Moyer regarding a continuance and Moyer declined to request a continuance and asked for the trial to proceed without the testimony of J.T.

"12. The trial judge never ruled on the issue of the potential conflict.

"13. J.T. was discharged from St. Catherine's hospital on February 4, 2010, the fourth day of the trial. The discharge summary states: 'She was very well controlled on her symptoms . . . No psychotic symptoms were elicited and she was able to engage in conversation without side effects elicited and was willing to talk about her substance abuse and accept counseling for this.'

"14. J.T. did not appear during the hearing on remand from the Supreme Court. It is unknown what her testimony would have been regarding the criminal case.

"15. Mason opined that the evidence against Moyer was the strongest he had seen in a sex crime case. This evidence included an audio recording of fellatio being performed by the victim upon Moyer in a shed; a 'sex contract' prepared by Moyer in which the victim would earn points by performing sex acts; a condom containing Moyer's DNA with a partial match to the victim; and the physical trauma observed upon the victim.

"16. Moyer testified he asked Mason to preserve the testimony of J.T. This court does not find that testimony credible as at the time of the alleged conversation there was no reason to believe that J.T. would not be available for trial. Additionally, Mason testified he did not want to disclose to the prosecution the possibility of J.T. as a witness and to preserve her testimony would require notice to the state and the opportunity for the state to participate in the process, thus eliminating the potential surprise at trial of J.T.

"17. In this hearing, Moyer stated that Mason indicated to the trial court that he wished to withdraw as counsel because he had made too many mistakes and did not know

10

what he was doing. It was admitted by Moyer's counsel that there is nothing in the record to support this statement. This court has reviewed the trial transcript and noted that Judge Showalter was careful to create a record of all significant events during the course of the trial. This court finds that if such statement had been made by Mason, it would be reflected in the record and its absence leads to the conclusion that no such representation was ever made by Mason to the trial court.

"18. Finally, Moyer testified he indicated to Mason that J.T. was a critical witness and her absence was like 'ripping my heart out.' The record in the case demonstrates that Moyer was fully apprised of all developments and when given the option, decided to go forward with the trial and not request a continuance to secure the attendance or obtain the testimony of J.T."

The record reveals additional details regarding Mason's actions during Moyer's trial. Mason testified that four days prior to the jury trial, he contacted Saint Francis Community Services regarding J.T., which confirmed J.T. was in its custody. On the first day of trial, Mason called Saint Francis again, but Saint Francis could not tell him J.T.'s whereabouts. The next day, Saint Francis told Mason that J.T. was at St. Catherine Hospital but Mason could not speak with her because he was not on her contact list. Mason later obtained an agreement to put him on the contact list. A memo to file prepared by Mason related that he spoke with J.T. on the third day of trial about her testimony and that she had confirmed her earlier statement about J.M. fabricating the allegations against Moyer. At the *Van Cleave* hearing, the memo was offered not for the truth of J.T.'s statements but to show what Mason had done based on what J.T. had told him.

On the question of whether Mason had a conflict of interest, the *Van Cleave* court found that Mason had a conflict when Mason discovered J.T. may not be available to testify at Moyer's trial due to her psychiatric issues. But the *Van Cleave* court opined that Moyer was not prejudiced because Mason's conflict had not adversely affected his performance in representing Moyer. The court reasoned that Mason and Moyer had

11

conferred; they had discussed options at length; and they had reached a justified strategic decision not to have J.T. testify.

With regard to Mason's performance, the *Van Cleave* court found the reasons given for not preserving J.T.'s testimony prior to trial and for not issuing a subpoena until after the trial had commenced to be reasonable trial strategy, rather than defective performance. The *Van Cleave* court relied upon Mason's testimony that "'Moyer was abundantly concerned about the influence that law enforcement had had in this case, and in twisting what had been said by various witnesses to their advantage.'"

Alternatively, the *Van Cleave* court found that, even assuming J.T. would have testified consistent with her earlier statement, that testimony would not have had any effect on the verdict for two reasons: (1) J.T. was considered to be extremely unreliable and untruthful; and (2) the State's evidence was so overwhelming. Consequently, the court opined that Moyer was not prejudiced by Mason's inability to present J.T.'s exculpatory testimony to the jury.

Moyer timely appealed the *Van Cleave* court's decision. He purports to raise multiple issues, but our remand was for the district court to determine whether Moyer was denied his Sixth Amendment right to counsel based on defense counsel's actions relating to a potential exculpatory witness. 306 Kan. at 384-85. In addition, we reserved our decision on cumulative error until the determination of whether there had been a Sixth Amendment violation to factor into that analysis. Accordingly, we limit our review to the remand question and the reserved issue.

SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." The "'right to

12

counsel is the right to *effective* assistance of counsel.'" (Emphasis added.) *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "In other words, to be meaningful the right to counsel necessitates more than a lawyer's mere presence at a proceeding." *State v. Cheatham*, 296 Kan. 417, 430, 292 P.3d 318 (2013). "The purpose of the effective assistance guarantee 'is simply to ensure that criminal defendants receive a fair trial.' *Strickland*, 466 U.S. at 689. To fulfill this function, 'counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest.'" *State v. Galaviz*, 296 Kan. 168, 174, 291 P.3d 62 (2012) (quoting *Strickland*, 466 U.S. at 689). "[The] Sixth Amendment right to counsel is made applicable to state proceedings by the Fourteenth Amendment to the United States Constitution." *Cheatham*, 296 Kan. at 430.

The questions we originally identified as needing resolution were whether Moyer was denied his constitutionally guaranteed effective assistance of counsel because (1) Mason's concurrent representation of J.T. and Moyer created an adverse conflict of interest; and/or (2) Mason's failure to secure J.T.'s presence at trial or to preserve her testimony was deficient performance. Those claims are analyzed differently. See *Mickens v. Taylor*, 535 U.S. 162, 173-74, 122 S. Ct. 1237, 152 L. Ed. 2d 291, *reh. denied* 535 U.S. 1074 (2002); *Cheatham*, 296 Kan. at 430-31. We will address each question in turn, but first we pause to summarily dispense with issues in Moyer's supplemental brief that were either not the subject of our remand or are not relevant to our task at hand.

Moyer first complains that the *Van Cleave* court erred by limiting the scope of the remand and hearing. Specifically, Moyer wanted to establish that Mason was not qualified under K.A.R. 105-3-2(a)(3) to represent indigent defendants charged with an off-grid felony, and that the trial court misunderstood Mason's experience and training. That inquiry was not part of our remand. Moreover, inexperience does not create a presumption of ineffectiveness; that determination requires an evaluation of the attorney's actual performance. See *United States v. Cronic*, 466 U.S. 648, 665, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984); *Cheatham*, 296 Kan. at 432-33, 436 (holding defense counsel's

13

failure to meet ABA guidelines for death penalty counsel did not itself render counsel ineffective; discussing guidelines with a "focus on the particular requirements to defend [defendant's] case and whether any failure to fulfill those requirements led to specific trial errors" under *Strickland*'s two-part test); *Flynn v. State*, 281 Kan. 1154, 1161-62, 136 P.3d 909 (2006) (holding "K.A.R. 105-3-2 does not short circuit the application of the two-part [*Strickland*] test or abolish the defendant's burden to identify specific acts or omissions that fall outside the range of reasonable professional judgment and demonstrate prejudice based on deficient performance").

Likewise, Moyer's attempt to identify other instances of deficient performance, as well as raising billing irregularities by Mason, exceed the scope of the remand issues and need no further discussion. His invitation for us to reweigh the evidence is declined. And his request for us to take judicial notice of Mason's unrelated disciplinary cases is denied. Moyer's burden in this appeal is to establish that Mason's performance was deficient in his case. Accordingly, we proceed to consider the questions that are before us.

The general rule governing ineffective assistance of counsel claims is deficient attorney performance. *Mickens*, 535 U.S. at 166. Under this category, a criminal defendant must satisfy the two-part *Strickland* test by proving: "'"(1) counsel's performance was deficient, which means counsel made errors so serious that counsel's performance was less than that guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced the defense, which requires showing counsel's errors were so serious they deprived defendant of a fair trial."'" *Cheatham*, 296 Kan. at 431. "In other words, the defendant must show there is a reasonable probability the result would have been different but for counsel's errors." *State v. McDaniel*, 306 Kan. 595, 607, 395 P.3d 429 (2017) (citing *Strickland*, 466 U.S. at 694).

An ineffective assistance of counsel claim based on a conflict of interest is "more nuanced." *Galaviz*, 296 Kan. at 181. "The right to counsel extends a duty of loyalty from

14

counsel to the client so '[a] defendant in a criminal trial must have "'representation that is free from conflicts of interest.'""" *Sola-Morales v. State*, 300 Kan. 875, 883, 335 P.3d 1162 (2014). "[W]hen a defendant's attorney actively represents conflicting interests there 'may' be '"circumstances of [such] magnitude"' that the 'likelihood that the verdict is unreliable is so high that a case-by-case inquiry is unnecessary.'" *Galaviz*, 296 Kan. at 181-82 (quoting *Mickens*, 535 U.S. at 166). There are three conflict of interest subcategories, but they all share "a starting point—the defendant must establish that his or her attorney had an active conflict of interest." *Galaviz*, 296 Kan. at 182. As this court stated in *Sola-Morales*:

> "Beyond this starting point, the type of alleged conflict dictates what the defendant must additionally establish to prevail. The United States Supreme Court has recognized three subcategories of conflict of interest claims: (1) the automatic reversal exception, (2) the adverse effect exception, and (3) what we have labeled the '*Mickens* reservation.' See [*Galaviz*,] 296 Kan. at 181-85 (discussing the three *Mickens* subcategories).

> "The first subcategory of conflict of interest claims, *i.e.*, the automatic reversal exception, is relevant only in cases of 'multiple concurrent representation,' which is when defense counsel 'is simultaneously representing codefendants with antagonistic interests in the same proceeding.' *Stovall*, 298 Kan. at 376 (citing *Galaviz*, 296 Kan. at 183). This exception additionally requires an objection to the representations before or during the proceedings and also a failure of the district court to inquire and determine there is no conflict. *Galaviz*, 296 Kan. at 183. Under this exception, as with the *Cronic* exception, reversal is automatic—unless the district court determines there is no conflict of interest. 296 Kan. at 183; see *State v. Gleason*, 277 Kan. 624, 650, 88 P.3d 218 (2004).

> "While the second subcategory, *i.e.*, the adverse effect exception, also requires an attorney conflict of interest through concurrent representation of codefendants, it is dissimilar from the automatic reversal exception because it arises when no objection to the conflict is lodged before or during the proceedings. *Stovall*, 298 Kan. at 376 (citing *Galaviz*, 296 Kan. at 183). And under this particular exception, '"a defendant must demonstrate that 'a conflict of interest *actually affected* the adequacy of his

15

representation."'" (Emphasis added.) *Galaviz*, 296 Kan. at 183 (citing *Mickens*, 535 U.S. at 168); see *Gleason*, 277 Kan. at 650. This standard is lower than *Strickland* 's, which imposes a burden on defendant to show actual prejudice by the attorney's performance, *i.e.*, 'probable effect upon the outcome of the trial.' 296 Kan. at 184 (citing *Mickens*, 535 U.S. at 174).

"The third subcategory, *i.e.*, the *Mickens* reservation, is relevant where a conflict is '"rooted in counsel's obligations to *former* clients"' or '"counsel's personal or financial interests."' *Galaviz*, 296 Kan. at 184 (quoting *Mickens*, 535 U.S. at 174). We have referred to this subcategory as the *Mickens* reservation because the Supreme Court did not articulate what additional burden, *e.g.*, prejudice or adverse effect, a defendant must satisfy before receiving relief based on such conflicts of interest. *Mickens*, 535 U.S. at 176; 296 Kan. at 184-86; see *State v. Cheatham*, 296 Kan. 417, 449-50, 292 P.3d 318 (2013)." *Solo-Morales*, 300 Kan. at 883-84.

With the foregoing in mind, we turn first to the conflict of interest claim.

*Conflict of Interest*

Moyer argues that Mason had two conflicts of interest that deprived Moyer of effective assistance of counsel: (1) Mason's financial interest in continuing to represent both Moyer and J.T.; and (2) the conflict between the duty Mason owed to J.T. and the duty he owed to Moyer.

*Standard of Review*

"Ineffective assistance of counsel claims—whether based on deficient performance or conflict of interest—involve mixed questions of fact and law. We review the *Van Cleave* court's underlying factual findings for support by substantial competent evidence and its legal conclusions based on those facts de novo. [Citations omitted.]" *Cheatham*, 296 Kan. at 430.

16

*Analysis*

Moyer points out that Mason was being paid by Sherman County to represent J.T. at the same time that he was earning compensation from BIDS for representing Moyer. He then argues that Moyer's financial interest in both cases created an actual conflict of interest requiring reversal. For support, Moyer relies on *Cheatham*, in which this court held that defense counsel's flat fee agreement with his death-penalty-defendant client created a conflict of interest that adversely affected the adequacy of defense counsel's representation. 296 Kan. at 452-53.

The *Van Cleave* court did not address this aspect of Moyer's conflict of interest claim. Nevertheless, we can dispose of it in short order. The flat fee arrangement in *Cheatham* is not analogous to Mason's circumstance. To the contrary, there was nothing unusual or untoward about Mason's fee arrangements. Indeed, as the State asserts, in almost all concurrent representation cases, the attorney will be receiving compensation from both clients. That circumstance, standing alone, cannot establish a conflict of interest, and Moyer does not show how the respective fee arrangements affected Mason's performance in Moyer's case. Cf. *Cheatham*, 296 Kan. at 454 (explaining how the financial disincentive under which defense counsel labored adversely affected the attorney's performance). In short, Moyer's financial interest argument is unavailing. We turn to the claim that Mason's concurrent representation of J.T. and Moyer violated his Sixth Amendment right to counsel.

Upon remand, the *Van Cleave* court found that it was undisputed that Mason was the guardian ad litem for J.T. in her CINC case during the time that he also represented Moyer in the criminal case. The *Van Cleave* court opined that Mason's concurrent representation of J.T. and Moyer became a conflict of interest when Mason learned that

17

J.T.'s psychiatric issues may prevent her from being available to testify at Moyer's trial. The court explained:

"Mason testified that he did not believe he had a conflict of interest at the time J.T. first revealed the information that the victim in Moyer's criminal case had told J.T. that the allegations against Moyer were false. Mason stated that J.T. and Moyer were not adverse to each other and it was indicated in argument that the dual representation may have provided an advantage to Moyer by allowing Mason unrestricted contact with J.T.

"It was when Mason discovered J.T. may not be available as a witness due to her psychiatric issues that Mason recognized a potential conflict. As GAL, Mason had a legal duty to protect the best interests of J.T. which would include advocating against her testifying in the Moyer trial if he believed that appearing as a witness would be harmful to J.T.'s health. Mason also knew that J.T. may have valuable evidence favorable to Moyer. This was a conflict."

Moyer contends that the conflict arose on January 11, 2010, when Mason learned J.T. had exculpatory information. He argues that Mason could no longer fulfill his ethical obligation of loyalty to both clients at that point, albeit he does not explain why that would be so. At the beginning of the *Van Cleave* hearing, the *Van Cleave* court took judicial notice of J.T.'s CINC file and the corresponding SRS records. Although those records do not appear in the record on appeal, we presume they supported the *Van Cleave* court's finding that Mason's representation of Moyer became materially limited by his responsibilities to J.T. only upon discovering that it may be detrimental to J.T.'s health to testify at Moyer's trial. See *State v. Bridges*, 297 Kan. 989, 1001, 306 P.3d 244 (2013) (party claiming error has burden to designate a record affirmatively showing prejudicial error; without such record, appellate court presumes the trial court action was proper).

The State does not dispute the *Van Cleave* court's finding that, at the point J.T.'s testimony became difficult to secure, Mason had a conflict of interest that implicated Moyer's Sixth Amendment right to effective assistance of counsel. Likewise, the State

18

does not challenge the *Van Cleave* court's application of the adverse effect standard to this conflict circumstance. Cf. *Galaviz*, 296 Kan. at 192 (applying adverse effect test when court could not determine whether representation was concurrent or successive because "'the State does not argue any other test should be applied'"). This court recently reiterated that under the *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), standard used in the adverse effect exception, "the defendant must demonstrate counsel labored under an active conflict of interest that affected the adequacy of representation." *McDaniel*, 306 Kan. at 610 (citing *Galaviz*, 296 Kan. at 183-84); see also *Mickens*, 535 U.S. at 165 (citing *Cuyler*). The *Cuyler* standard does not require that the defendant show *Strickland* prejudice. Instead, the defendant "must show '"both an actual conflict of interest and an adverse effect."'" *McDaniel*, 306 Kan. at 611 (quoting *Mickens*, 535 U.S. at 165); see also LaFave, Criminal Procedure § 11.9(d) (4th ed. 2018) (*Culyer* "requires a showing both that counsel was placed in a situation where conflicting loyalties pointed in opposite directions [an 'actual conflict'] and that counsel proceeded to act against the defendant's interests ['adversely affect[ing] his performance'])."

In finding no adverse effect, the *Van Cleave* court reasoned:

"Even though Mason had a conflict, that is not determinative on the question of ineffective assistance of counsel. Knowing the situation, Mason and Moyer conferred and discussed at length the options that may be available. Moyer testified in this hearing that after learning of the 'laundry list' (his words) of reasons not to have J.T. testify, he agreed with Mason's advice not to call her as a witness. Both Mason and Moyer reached a strategic decision not to have J.T. testify. Based upon the information available at that moment, this was justified."

For the first time on appeal, the State argues this court should adopt Colorado's test to determine if Moyer has proven an adverse effect. In *West v. People*, 341 P.3d 520 (Colo. 2015), the Colorado Supreme Court noted that in the cases before the court,

"[w]hether 'actual' conflicts [of interests] existed . . . will turn on whether the alleged conflicts adversely affected [defense] counsels' performances." 341 P.3d at 531. Then, the court set out to define "adverse effect," noting that the term was not defined in *Mickens* and that this lack of guidance has led to differing standards applied by lower courts. 341 P.3d at 531.

*West* discussed the different adverse effects tests employed by the federal circuits and noted that the majority require the defendant to satisfy a two-part standard by proving "'that some plausible alternative defense strategy or tactic might have been pursued, and that the alternative defense was inherently in conflict with or not undertaken *due to* the attorney's other loyalties or interests.'" 341 P.3d at 532 (quoting *United States v. Levy*, 25 F.3d 146, 157 [2d Cir. 1994], and collecting cases from the 1st, 5th, 9th, and 10th circuits applying the same or similar tests).

*West* noted other circuits add a requirement to the two-part test and require a defendant to show "that the alternative strategy was 'objectively reasonable' under the facts known to the attorney at the time of the strategic decision." 341 P.3d at 532 (citing 4th, 8th, and 11th Circuit cases). *West* noted that the three-part standard was attractive because the Fourth Circuit relied upon it in *Mickens*, and, while the standard's propriety was not at issue, the Supreme Court did not disavow the standard. 341 P.3d at 533.

Finally, *West* noted the Seventh Circuit requires a showing "'that there is a *reasonable likelihood* that his counsel's performance would have been different had there been no conflict of interest.'" 341 P.3d at 532 (quoting *Hall v. United States*, 371 F.3d 969, 974 [7th Cir. 2004]).

*West* held the two-part test was "too deferential to counsel's subjective assessment of his representation," as "[r]esearch indicates that attorneys 'systematically understate both the existence of conflicts and their deleterious effects.'" *West*, 341 P.3d at 532

20

(quoting Eldred, *The Psychology of Conflicts of Interest in Criminal Cases*, 58 U. Kan. L. Rev. 43, 48 [2009]). Additionally, *West* held the Seventh Circuit's standard was inconsistent with Supreme Court precedent requiring an *actual* conflict, which *West* held required more than a "reasonable likelihood that counsel's performance would have been different." 341 P.3d at 532. Therefore, *West* adopted the Fourth Circuit's approach.

In *Cheatham*, this court discussed the Seventh Circuit test in evaluating a claim that a flat fee agreement adversely affected defense counsel's performance. 296 Kan. at 452 (Quoting *Stoia v. United States*, 109 F.3d 392, 395 [7th Cir. 1994].) ("'An actual conflict of interest . . . has an adverse effect if "but for the attorney's actual conflict of interest, there is 'a [reasonable] likelihood that counsel's performance somehow would have been different.'"'"). The State does not address *Cheatham*'s citation to the Seventh Circuit standard. Further, the State's argument that Kansas should adopt the *West* standard was not made to the *Van Cleave* court, and, therefore, the *Van Cleave* court could not have made findings with a view to that standard. Cf. *People v. Villanueva*, 374 P.3d 535, 539 (Colo. App. 2016) (holding in light of intervening authority in *West*, district court erred in analyzing conflict of interest claims, remanding for findings on each part of the *West* standard). Nevertheless, we do not discern that the result in this case will be affected by the test that is applied.

Moyer contends that, because of Mason's conflict, he could never give conflict-free advice on whether Moyer should insist on J.T. being called as an exculpatory defense witness at Moyer's trial. But that argument conflates the existence of the conflict and the effect of the conflict. To prevail on an adverse effect claim, the defendant "must first establish his or her attorney '"actively represented conflicting interests"'" and further must establish adverse effect by showing "'"a conflict of interest *actually affected* the adequacy of his representation"'" *Sola-Morales*, 300 Kan. at 883-84. Here, after Mason learned of the conflict, he discussed the matter with Moyer. Specifically, he outlined the risks

21

associated with calling a witness with credibility and psychiatric issues. Together, Mason and Moyer made the decision to forego attempting to force J.T.'s testimony.

Under the two- and three-part tests discussed in *West*, in light of J.T.'s credibility issues and commitment to psychiatric care, Moyer did not establish a plausible alternative defense strategy that Mason could have pursued. See *West*, 341 P.3d at 532. Further, under the three-part test, Moyer has not established that such an alternative strategy was "objectively reasonable." And finally, under the Seventh Circuit test, he did not show a "reasonable likelihood that his counsel's performance would have been different had there been no conflict of interest." *Hall*, 371 F.3d at 974. Consequently, the *Van Cleave* court's determination that Moyer failed to establish that the conflict adversely affected his attorney's performance is affirmed.

*Deficient Performance*

This court remanded on the question of whether Mason provided constitutionally competent representation to Moyer because of his challenges to the manner and timeliness with which J.T. was subpoenaed and the failure to take steps before trial to preserve J.T.'s testimony. We analyze deficient performance claims under the two-part *Strickland* test, i.e., was Mason's performance deficient, and, if so, did that deficient performance prejudice the defense to the extent that Moyer was deprived of a fair trial?

The *Van Cleave* court found that Mason did not suspect that there would be any problem with J.T.'s availability for trial. Accordingly, the court accepted Mason's stated reason for not taking a pretrial deposition and for delaying the issuance of the subpoena—to avoid tipping off the State to J.T.'s existence—as a reasonable trial strategy. That holding was further supported by Mason's testimony that Moyer was concerned about the influence law enforcement personnel would have on the witnesses in the case.

22

Moyer contends that "'[m]ere invocation of the word "strategy" does not insulate the performance of a criminal defendant's lawyer from constitutional criticism,' especially '"when counsel lacks the information to make an informed decision due to inadequacies of his or her investigation."' *Wilkins v. State,* 286 Kan. 971, 982, 190 P.3d 957 (2008)." *State v. Gonzales*, 289 Kan. 351, 358, 212 P.3d 215 (2009), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). But Moyer "bears the burden of demonstrating that trial counsel's alleged deficiencies were not the result of strategy." *State v. Holmes*, 278 Kan. 603, 629, 102 P.3d 406 (2004). His effort in that regard involves arguing that J.T.'s status as a juvenile in SRS custody with out-of-home placement by Saint Francis made it very predictable that an objection to the child's appearance at a criminal trial would be lodged by someone. But as noted above, the CINC files and SRS records which might give credence to such speculation are not part of the record on appeal. The *Van Cleave* court's finding that Mason did not anticipate an issue with J.T.'s attendance at the trial is supported by substantial competent evidence in the record.

Likewise, Moyer's declaration that the *Van Cleave* court's ruling on trial strategy "flies in the face of binding case law" suffers from a lack of supporting citations. For instance, Moyer points to *Swenson v. State*, 284 Kan. 648, 650, 654, 162 P.3d 808 (2007), where this court held that defense counsel's failure to abide by a defendant's request to file a timely petition for review fell below an objective standard of reasonableness and effectively denied Swenson his statutory right to effective assistance of counsel. But that holding relied on *Kargus v. State*, 284 Kan. 625, 162 P.3d 818 (2007), a companion case issued on the same day. *Kargus* was founded on the notion that the *Strickland* prejudice approach did not apply when counsel fails to file an appeal because failure to file the requested appeal "'arguably led not to a judicial proceeding of disputed reliability, but rather to the forfeiture of a proceeding itself.'" 284 Kan. at 636-37 (quoting *Roe v. Flores-*

23

*Ortega*, 528 U.S. 470, 483, 120 S. Ct. 1029, 145 L. Ed. 2d 985 [2000]). Here, Moyer got his proceeding. In fact, he agreed to continue that proceeding without J.T.'s testimony.

In sum, Moyer failed to meet his burden of establishing that Mason's performance with regard to J.T.'s testimony was deficient. Nevertheless, even if deficient performance is assumed, Moyer had to establish the prejudice prong, i.e., "the defendant must establish a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." *Edgar v. State*, 294 Kan. 828, 829, 283 P.3d 152 (2012). The *Van Cleave* court held that, even if J.T. had testified, it would have had no effect on the verdict. Giving deference to the lower court's credibility assessments and considering the overwhelming evidence against Moyer, we agree that there was no reasonable probability that the outcome of the case would have been any different had J.T. testified.

CUMULATIVE ERROR

"'Cumulative trial errors, when considered collectively, may require reversal of the defendant's conviction when the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial.'" *State v. McLinn*, 307 Kan. 307, 334, 409 P.3d 1 (2018). "By necessity, if this court must apply a totality of the circumstances test, we must review the entire record and engage in an unlimited review." *State v. Cruz*, 297 Kan. 1048, 1074, 307 P.3d 199 (2013). Obviously, then, we were not in a position to finally decide the question of cumulative error until we determined if the totality of the circumstances included a defense counsel who had a conflict of interest and/or who performed deficiently. We can now proceed with that analysis.

To summarize, we found the following errors in our opinion prior to our remand for a *Van Cleave* hearing:

24

- *Showing the Victim's Unredacted Intake Interview*:  The trial court ruled J.M.'s intake interview, from the Western Kansas Child Advocacy Center conducted after she reported Moyer's abuse to police, was admissible if certain portions were redacted. During deliberations, the jury mistakenly viewed a portion of J.M.'s unredacted intake interview. This court held the trial court did not abuse its discretion in denying Moyer's motion for mistrial because although this was a fundamental failure in the proceeding, viewing the entire record, "the prejudicial effect of the challenged evidence was ameliorated by the fact that there was properly admitted inculpatory evidence of the same ilk." *Moyer*, 306 Kan. at 354-58.

- *Unanimity Instruction/Failure to Effectively Elect*:  The jury heard evidence of multiple acts that could have supported Count 2, criminal sodomy (two potential acts of fellatio occurring on the same date in the family minivan during a trip to Walmart). The trial court did not give a unanimity instruction, and the State failed to effectively elect. This court held the ineffective election harmless because the court was firmly convinced that "viewing the entire record—including Moyer's general denial—there is no reasonable probability that the result would have been different." 306 Kan. at 358-63.

- *K.S.A. 60-455 Limiting Instruction*:  The trial court permitted the State to admit evidence of Moyer's prior acts of sexual misconduct pursuant to the 2009 amendments to K.S.A. 60-455. On appeal, this court held any error in the drafting of the K.S.A. 60-455 limiting instruction was completely harmless given the 2009 amendments to that statute rendering obsolete limiting instructions in sex crime prosecutions. 306 Kan. at 363-66.

- *Prosecutorial Error*:  During closing argument, the prosecutor impermissibly commented on facts outside the record by stating there is always corroborating physical evidence in these types of cases. The isolated comment did not deny Moyer a

25

fair trial. Under the *State v. Tosh*, 278 Kan. 83, 93-98, 91 P.3d 1204 (2004), framework, first, the comment was gross and flagrant because the prosecutor should have known not to make arguments for which there is no evidentiary support; second, the comment was not motivated by ill will, as the comment appeared to undervalue the large amount of physical corroborating evidence; finally, the evidence against Moyer included J.M.'s intake interview, J.M.'s trial testimony, J.M.'s sexual trauma, DNA evidence, and, "perhaps most compelling," the audio recording from the shed. *Moyer*, 306 Kan. at 366-69.

- *Trial Judge Recusal*: Moyer moved to recuse trial judge Scott Showalter because the trial judge's son participated in Moyer's arrest and was listed as a witness for the State. The judge "resolved the potential conflict by altering the evidence in the case, *i.e.*, the judge formally struck [his son] as a witness and denied Moyer's motion." 306 Kan. at 369. This court held Moyer failed to follow the statutory procedure for seeking recusal. Further, under the Code of Judicial Conduct and due process bases for recusal, Moyer did not show reversible error where the judge's son did not testify, the jury was never informed the judge had a relative that was involved in the case, and there was no showing of actual bias or prejudice. 306 Kan. at 369-76. Justice Rosen dissented on this point, opining all three bases required the trial judge's recusal. 306 Kan. at 385-90 (Rosen, J., dissenting).

To the foregoing, we must add that the *Van Cleave* court found, and the State does not contest, that defense counsel had an active conflict of interest during Moyer's trial. See *Boldridge v. State*, 289 Kan. 618, 640-41, 215 P.3d 585 (2009) (analyzing ineffective assistance of counsel claims not requiring reversal on their own for cumulative error). Nevertheless, that circumstance does not tip the scales.

In *State v. Holt*, 300 Kan. 985, 1007-08, 336 P.3d 312 (2014), this court discussed the process of evaluating whether the cumulative errors are harmless:

26

"[A]n appellate court examines the errors in the context of the record as a whole considering how the trial judge dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence. See *State v. Ward*, 292 Kan. 541, 578, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). 'No prejudicial error may be found upon this cumulative effect rule . . . if the evidence is overwhelming against the defendant.' *State v. Colston*, 290 Kan. 952, Syl. ¶ 15, 235 P.3d 1234 (2010); see, *e.g.*, *Alvarez v. Boyd*, 225 F.3d 820, 824-25 (7th Cir. 2000) (listing various factors to be considered in cumulative error analysis), *cert. denied* 531 U.S. 1192 (2001); *United States v. Fernandez*, 145 F.3d 59, 66 (1st Cir. 1998) (same)."

The *Van Cleave* court found that "[t]he evidence of guilt in this case was overwhelming." In our earlier opinion, we noted the strength of the evidence by discussing J.M.'s intake interview, J.M.'s trial testimony, DNA evidence (DNA from the inside of a condom and a rag the State asserted J.M. saved from prior sexual encounters matched Moyer's DNA; a partial DNA profile from the outside of the condom was consistent with J.M.'s DNA profile; none of the samples were consistent with Moyer's wife's profile), evidence of J.M.'s sexual trauma, and "perhaps most compelling" the audio recording from the shed (with "sounds . . . indicative of sexual acts taking place" and conversations between J.M. and Moyer suggesting the same). *Moyer*, 306 Kan. at 346-50, 368-69. Although there were multiple trial errors in this case, "the same reasons that led us to find that the individual errors were not reversible lead us to be firmly convinced beyond a reasonable doubt that the result of this trial would have been no different without the errors." *Cruz*, 297 Kan. at 1074. In other words, the cumulative effect of the errors did not deny Moyer a fair trial.

Affirmed.

NUSS, C.J., and LUCKERT, J., not participating.

MICHAEL J. MALONE, Senior Judge, assigned.[1]

DAVID E. BRUNS, J., assigned.[2]

\* \* \*

ROSEN, J., dissenting: I would simply adopt my dissenting opinion in the original appellate decision and now expanded on in Senior Judge Michael Malone's dissenting opinion in this appeal. See *State v. Moyer*, 302 Kan. 892, 935, 360 P.3d 384 (2015), *as modified in* 306 Kan. 342, 385, 410 P.3d 71 (2017). As a result, I would reverse the convictions in this matter and remand for a new trial with a different judge.

\* \* \*

JOHNSON, J., dissenting: I cannot join the majority's holding that the cumulative effect of the errors did not deny the defendant a fair trial because there was overwhelming evidence. A fair trial is a due process requirement, and the process due a criminal defendant should not be inversely proportional to the amount and quality of the evidence the State has gathered. In other words, fairness should not be measured by the quantum of State's evidence. This notion is not a personal epiphany of recent origin; my predecessors on this court unanimously made the declaration over a decade ago in

---

[1] **REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 105,183 vice Justice Nuss under the authority vested in the Supreme Court by K.S.A. 20-2616.

[2] **REPORTER'S NOTE:** Judge Bruns, of the Kansas Court of Appeals, was appointed to hear case No. 105,183 vice Justice Luckert under the authority vested in the Supreme Court by K.S.A. 2017 Supp. 20-3002(c).

expressing frustration with numerous cases where the State argued prosecutorial misconduct was harmless error because of the overwhelming evidence against the defendant:

> "Taken to its logical conclusion, acceptance or endorsement of this attitude would lead to a rule that the greater the evidence against a defendant, the less right that defendant has to a fair trial. Neither law nor basic justice can tolerate such a rule. Denial of a fair trial violates the due process rights of the guilty defendant just as surely as those of the innocent one." *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004), *overruled on other grounds by State v. Sherman*, 305 Kan. 88, 378 P.3d 1060 (2016).

And, in adopting a new test for prosecutorial error in 2016, this court unanimously reaffirmed its agreement with and ongoing commitment to this portion of *Tosh. Sherman*, 305 Kan. at 105.

Notwithstanding the *Van Cleave* court's assessment of the amount of evidence, Moyer did not receive a fair trial. There were many errors, and they touched on most of the areas of the trial. Importantly, the errors impacted the evidence that was presented, or rather not presented. Indeed, one might surmise that Moyer's best hope for a favorable result rested with the testimony of J.T. that the victim had lied about being abused, which evidence was arguably not available because of his own attorney's conflict of interest and/or incompetence.

In *State v. Kemble*, 291 Kan. 109, 120, 238 P.3d 251 (2010), we discussed that "[t]he lines of demarcation separating the duties of each of the players in a criminal trial are sacrosanct, *i.e.*, the prosecutor representing the people; the defense attorney representing the accused; the trial judge representing the interpreter of the law; and the jury representing the finder of facts." We suggested that a breakdown in the execution of any of the respective duties compromised the entire criminal justice system. Here, we had a breakdown in the execution of the duties of three-fourths of those players: the trial

judge had a conflict of interest; the defense counsel had a conflict of interest; and the prosecutor engaged in gross and flagrant misconduct. That level of unfairness simply cannot be condoned under our system of criminal justice, even if the defendant is unquestionably guilty of despicable acts.

In short, I would reverse and grant a new trial, at which the State, the district court, and the defense attorney can do it correctly and fairly.

* * *

MALONE, J., dissenting:  This is an extraordinary case where the combined errors by the judge, prosecutor, and defense counsel substantially prejudiced the defendant and call into question the overwhelming evidence of guilt relied upon by the majority to affirm his convictions and deny him a new trial.

In this second appeal following a *Van Cleave* remand, I agree with Justice Johnson that our justice system demands a new trial for the defendant, one free of the numerous serious errors and conflicts that permeated his first trial. Also, I adopt Justice Rosen's well-reasoned dissent in the original appellate decision *State v. Moyer*, 306 Kan. 342, 385-90, 410 P.3d 71 (2107) (Rosen, J., dissenting) (*Moyer I*), in support of my conclusion that the judge's conflict led the way in substantially prejudicing the defendant in this case by denying him a fair trial.

As I was not a member of the *Moyer I* court, I am compelled to focus on the most egregious of six errors—the judicial conflict of interest—which infected the trial with unfairness from voir dire to verdict. The judge's conflict was clear and conspicuous to all involved, including members of the jury. His son was an endorsed law enforcement witness for the prosecution *prior to* the arrest of the defendant. The judge signed the arrest warrant that his son then executed by arresting the defendant. Nevertheless, the

30

*Moyer I* majority held the judge's continued handling of the case was not grounds for reversal. 306 Kan. at 369-76. For reasons detailed in this dissent, this holding essentially lowers the standard of judicial conflict (and cumulative error) to a level of nonexistence.

A closer look at the material facts, neither fully developed nor addressed in *Moyer I*, is necessary to illustrate both the judge's substantial conflict and how that conflict denied Moyer a fair trial.

The judge's son, Jason Showalter, worked as a deputy for the Sherman County Sheriff. As common with most sparsely populated counties, the sheriff employs only a handful of deputies. The sheriff's office, which is located in Goodland, Kansas, was the law enforcement agency that initiated the criminal investigation against the defendant, who also lived in the county seat with his family, including a daughter who is the alleged victim.

On the morning of April 9, 2009, the probable cause affidavit and Complaint/Information, naming "Deputy Jason Showalter" as the 4th of 13 witnesses for the prosecution was presented to Judge Showalter. The judge found probable cause, signed the arrest warrant, and set bond at $250,000. Thereafter, Deputy Showalter, along with another Sherman County deputy, executed the warrant and arrested the defendant in Goodland, Kansas. That same morning Judge Showalter held a first appearance for the defendant, appointed counsel, and scheduled a preliminary hearing. As the case progressed through the court, not only was Deputy Showalter listed as a witness in the original Complaint/Information, but also in the amended, the second amended, and the third amended Complaint/Information. The last being filed by the prosecution on the final day of the jury trial. Deputy Showalter was also given numerous public record notices of hearing by the Sherman County Attorney with copies sent to the Sherman County Clerk of the Court and Judge Showalter.

31

Obviously concerned that the judge's son being listed as a witness for the prosecution would give an "impression to the jury of favoritism," the defendant asked the judge to recuse himself. In opposing the request for a change of judge, the prosecutor indicated she would not call the judge's son as a witness in the case-in-chief; she would only call him as a witness if "[the son] would need to rebut something," but she did not anticipate "the defense needing to do that."

The judge refused to remove himself from the case. As an alternative remedy, he directed the prosecutor to "erase [my son's] involvement in this case" and ordered the parties not to mention his son's name during the trial.

In accordance with the judge's rulings, a jury was selected and the trial proceeded without his son's name ever being mentioned. The defendant was convicted and appealed.

Unless the witness endorsement only deals with a minor, nonmaterial matter, a judge should never preside over a case when his or her child is listed as a witness for either party. Canon 2, Rule 2.11(A)(2)(c) and (d) of the Kansas Code of Judicial Conduct require disqualification when the judge knows that a person with a third degree of relationship to the judge or his spouse/domestic partner is "a person who has more than a *de minimis* interest that could be substantially affected by the proceeding" or is "likely to be a material witness in the proceeding." 2014 Kan. Ct. R. Annot. 767-68.

A violation of this rule moves beyond an ethical violation to a constitutional due process violation when there is a likelihood that members of the jury pool are aware of this conflict. See *State v. Hurd*, 298 Kan. 555, 570, 316 P.3d 696 (2013) ("Recusal is required under the Fourteenth Amendment's Due Process Clause when the judge is actually biased or there is a constitutionally intolerable probability of actual bias."); *State v. Sawyer*, 297 Kan. 902, 909, 305 P.3d 608 (2013) (test asks "whether the judge had a duty to recuse from the case because the judge was biased, prejudiced, or partial" and

32

"whether the judge's failure to recuse resulted in actual bias or prejudice").

The *Moyer I* majority held the failure to recuse was harmless error because "where the jury was unaware that the judge's son was involved in Moyer's case, one cannot objectively declare that the probability of bias was unconstitutionally intolerable." 306 Kan. at 376. However, review of the voir dire transcript completely debunks this conclusion and shows the probability of bias against the defendant was extremely high and pervaded the trial.

It is true the record does not explicitly show the jurors were aware of the judge's son's involvement in the case. But using this as a basis for stating "the jury was unaware that the judge's son was involved in Moyer's case" is faulty reasoning in search of a desired result. See 306 Kan. at 376. The judge thwarted potential questioning of the jurors on this issue by striking his son's name from the witness list. The judge effectively changed the facts of this case rather than simply recusing himself. Even without the judge ordering that everyone pretend his son was not involved in the case, elementary trial practice explains why defense counsel would have avoided asking potential jurors about the judge's son. By remaining on the case, the judge placed defense counsel in an untenable position when questioning the jury rendering the voir dire inadequate, incomplete, and ineffective.

With the judge's continued presence in the case and/or his ban on speaking his son's name, there can be little doubt the voir dire was inherently defective. However, the potential jurors' comments during jury selection demonstrate beyond any doubt the high probability the jury knew both the judge's son and his involvement in the case.

The jury selection illuminates the small, close-knit community where this crime was charged. The voir dire questions and answers were replete with venireperson knowing each other, knowing law enforcement and other witnesses to be called by the

33

prosecution, and knowing those involved in the local court system. In addition, many venireperson were related to, friends with, or worked with others called for the same trial. A large number of the jury pool personally knew the sheriff. One potential juror indicated a friendship with "local judges and sheriffs" but stated she would be fair and impartial. Defense counsel accepted the juror with simply an "[o]kay." To which the judge added, "Evidently being my aunt isn't good enough." The venireperson replied using the judge's first name, "I tried, Scott."

At another time during voir dire, the following colloquy took place between defense counsel and another potential juror with the judge interjecting another comment of familiarity:

"MR. MASON:  Okay. I do have to say I did learn something new out of reading these questionnaires. I didn't know you came from Goddard, [first name of venireperson], I thought you'd been [in Goodland] forever.

"THE COURT:  The better question is, can we make her go back?

"[VENIREPERSON]:  Thank you, Scott."

Again, Scott is Judge Showalter's first name.

Given this small town or community familiarity coupled with the judge's order that his son's name not be mentioned during voir dire, it is baffling how the *Moyer I* majority could hold, "The probability of prejudice or bias that Moyer claims was intolerably high was actually zero percent with this jury, given that it was unaware of any facts that might lead to such a perception." 306 Kan. at 375.

Even before the trial began, the significance of this community familiarity with the details of the case was acknowledged by the judge when he explained why he was

34

denying defendant's motion for change of venue. Commenting on the lack of community ties the defendant and his family had, the judge stated:

> "It would seem to me that based upon two factors I think are important. First of all, it is my understanding that the Moyers [the defendant and his family] are not long-term residents to the community and they do not have a substantial base of people that know them nor [*sic*] their predicament based upon the charges."

The judge, who had lived in the small community for over 25 years, would have been well-served to apply the same "long-term residents" analysis to defendant's motion for change of judge. If no one knew the Moyer family or "their predicament" because they had not lived in Goodland very long, then presumably the numerous Sherman County citizens comprising the jury pool knew the judge's son would have investigated the case and was an endorsed witness for the prosecution. This presumption appears highly probable upon review of the questions and answers given during voir dire and the fact the attorneys could not, both by judge's order and by common sense, ask questions about the venirepersons' knowledge of the judge's son.

Unfortunately, the judge did not seem to appreciate the problem he was creating with his son being a potential witness in a trial he was presiding over. In denying the motion for a change of judge, the judge disclosed:

> "[I]t may have appeared to be some type of favorable involvement but I'm not sure that it would have been. If anything, I think I would have expected [my son] to perform at a higher level than maybe as required statutorily."

As Justice Rosen stated in his dissenting opinion in *Moyer I*, it was not the son's involvement that caused the problem, it was the judge's involvement. 306 Kan. at 386 (Rosen, J., dissenting). And his involvement could have been easily rectified by another judge handling the case, one not the father of an endorsed prosecution witness.

35

The foundation of our judicial system is to provide fair and impartial courts. Our democracy is built on the rule of law and justice delivered by these fair and impartial courts, not only in appearance but in practice. Here, the judge was ethically conflicted, and a high probability exists that members of the jury knew of the conflicting roles between son and father. This is not acceptable in a country where every citizen has the right to be tried by judges and juries that are unbiased and impartial.

I recognize that a majority of this court has already held that the judicial conflict was not in and of itself reversible error in *Moyer I*, where four other significant trial errors were found. Now in *Moyer II*, we have added another conflict with defense counsel, who was also guardian ad litem to a minor who would testify that the alleged victim admitted the criminal claim was not true. Defense counsel never called the minor, his other client, to give the exculpatory testimony. Yet even with this sixth error, the majority refuses to grant a new trial based on cumulative error.

> """Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. [Citations omitted.]"' *State v. Carter*, 305 Kan. 139, 166, 380 P.3d 189 (2016)." *State v. Sims*, 308 Kan. 1488, 1506, 431 P.3d 288 (2018).

> "If any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt. In making the assessment of whether the cumulative errors are harmless, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their

interrelationship, if any; and the strength of the evidence." *State v. Williams*, 308 Kan. 1440, Syl. ¶ 9, 430 P.3d 448 (2018).

With the character and the number of errors in this case, it is disingenuous for the *Moyer II* majority to say the verdict would have been the same because the evidence was strong. While we have stated no prejudicial error may arise under the cumulative error doctrine in a case of overwhelming evidence, to what extent should this principle be carried? In the face of overwhelming evidence, it would seem *no* error would be enough to warrant a new trial, and the term "right to a fair trial" becomes nothing more than window dressing and the actual trial becomes nothing more than a pretext to convict. Indeed, this court has observed that the strength of the evidence should not become the primary focus when applying a constitutional harmless error standard in prosecutorial error cases:

> "Appellate courts must simply consider any and all alleged indicators of prejudice, as argued by the parties, and then determine whether the State has met its burden—*i.e.*, shown that there is no reasonable possibility that the error contributed to the verdict. The focus of the inquiry is on the impact of the error on the verdict. While the strength of the evidence against the defendant may secondarily impact this analysis one way or the other, it must not become the primary focus of the inquiry. As has often been repeated, prejudice can exist even 'in a strong case.' *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 (1940)." *State v. Sherman*, 305 Kan. 88, 111, 378 P.3d 1060 (2016).

I strongly disagree with the holding of the majority that the serious errors in this case did not impact this jury, especially with the vast amount of prejudice from the judicial conflict affecting the jury selection and defense counsel's conflict resulting in the exclusion of an exculpatory witness. In addition to having a jury of dubious fairness and impartiality, these conflicts in essence changed the quantum of evidence itself through

the exclusion of witnesses, limitation of questions, and exclusion of exculpatory evidence. The evidence was indeed strong, but the character of the errors negate this court's finding that the verdict would have been the same without them. To not grant the defendant a new trial is affirming a conviction that is fraught with conflict, partiality, and unfairness.

For these reasons I would reverse and grant a new trial before a different judge.